**CIBA–GEIGY CORPORATION**

v.

**LOCAL #2548, UNITED TEXTILE WORKERS OF AMERICA, AFL–CIO et al.**

**Civ. A. No. 74–263.**

United States District Court, D. Rhode Island.

Feb. 25, 1975.

Michael P. DeFanti, Providence, R. I., for plaintiff.

David F. Sweeney, Warwick, R. I., Dennis J. Roberts, II, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

This matter is presently before the Court to consider defendants' motions to dismiss or, in the alternative, to stay the action pending state court interpretation of R.I.G.L. § 25–1–6 (1956, 1968 reenactment). For purposes of these motions, all well-pleaded and material allegations in the Complaint are taken to be true. 5 Wright & Miller, Federal Practice and Procedure: Civil § 1350.

A review of the facts and prior proceedings produces the following picture. Plaintiff, hereinafter "the Employer," is a New York corporation which operates a chemical manufacturing plant in Cranston, Rhode Island. Some of the chemi-

cals manufactured at the plant are produced by a chain of chemical reactions which require continuous operation of the facilities. As a result, the Employer applied for and was granted a permit to operate the plant on specified Sundays by the Rhode Island Director of Labor, pursuant to R.I.G.L. § 25–1–6 which provides, in pertinent part:

"25–1–6. *Work on holidays prohibited —Exceptions—Time and half.*—No person, firm or corporation shall require or permit an employee to work and no person shall engage in gainful activities in any store, mill or factory, or in any commercial occupation, or in the work of transportation or communication, or in the work of industrial process on Sundays or on any of the following holidays [omitted] except to perform such work as is both absolutely necessary and can lawfully be performed on Sunday; provided, however, that nothing herein contained shall prohibit the director of labor from granting a permit to perform such work upon written application therefor at least ten (10) days previous to the Sunday or holiday therein referred to or for such less time as the necessity of the occasion may require in the discretion of the director of labor, which application shall contain a sworn statement by or on behalf of such person, firm or corporation of the particular necessity to perform such work and the economic hardship which would otherwise prevail as declared in said application; and provided, that all employees working during Sundays and holidays under a permit granted by the director of labor shall receive from their employer at least time and a half for work so performed; provided further that nothing herein shall be a ground for discharge or other penalty upon any employee for refusing to work for any person, firm or corporation upon any of the holidays enumerated herein."

In compliance with R.I.G.L. § 25–1–6, the Employer pays its employees who work on Sundays in excess of the "time and a half" rate specified therein. Collective Bargaining Agreement, Art. III, § 2.

At its Cranston plant, the Employer employs a bargaining unit of approximately 385 employees who are all members of Local 2548 of the United Textile Workers of America, AFL–CIO, hereinafter "the Union", which acts as their collective bargaining representative. Employment of these workers is governed by a collective bargaining agreement which was negotiated and agreed to by the Employer and the Union, and ratified by a majority of its members. This agreement has been in effect since February 27, 1972 and expires on March 2, 1975.[1] The agreement contains the following material provisions:

"ARTICLE XI

GRIEVANCES AND ARBITRATION

Section 1.

A grievance shall be defined as any difference of opinion or dispute between an employee and the representatives of the Company regarding the interpretation and application of any provision of this Agreement.

If an employee shall have a grievance, there shall be an earnest effort on the part of both parties to settle it promptly through the steps listed below. It is understood, however, that no grievance shall be accepted for consideration unless presented in the first step within three (3) calendar

---

1. At the request of the parties and upon their representation that meaningful negotiations for a new collective bargaining contract could not continue until questions presently before this Court had been resolved, *see* n. 10 *infra*, the Court agreed to consider the Union's motions on an expedited basis. The Court heard oral argument and rendered this opinion orally, absent footnotes and editorial modifications, on February 25, 1975.

days of the occurrence of the incident first giving rise to the same.

\* \* \* \* \* \*

Section 7. *Arbitration*

a) Any grievance which shall involve the meaning and application of the provisions of this Agreement not adjusted under the steps above provided, may be appealed by the Vice President of the International Union to arbitration within ten (10) calendar days after an answer shall have been rendered by the Company in Step 3. An impartial arbitrator will be selected by agreement between the parties; provided, however, that a work stoppage in violation of the no-strike clause of Article XVI shall void any obligation on the part of the Company to arbitrate.

\* \* \* \* \* \*

c) The impartial arbitrator shall have authority only to interpret and apply the provisions of this Agreement, and he shall not have authority to alter or to add to in any way any of such provisions. He shall have no authority to interpret any State or Federal law when the compliance or non-compliance thereof shall be involved in the consideration of the grievance. He shall have authority to consider only a grievance presenting solely an arbitrable issue under this Agreement, unless the party questioning the arbitrability of an issue shall agree to submit the question of arbitrability to an arbitrator. . . . The decision of the arbitrator shall be rendered within one (1) month of the submission of the case to him and shall be final and binding on the Company, the Union, and the employee involved.

\* \* \* \* \* \*

ARTICLE XVI

STRIKES AND LOCKOUTS

During the term of this Agreement, the Union agrees that neither it nor any employee shall engage in or in any way encourage or sanction any strike, slowdown or other action which shall interrupt or interfere with work or production at the plant and the Company agrees that it will not engage in any lockout of employees at the plant."

In addition, the Employer argues that the agreement calls for a seven-day work week such that the Employer is empowered to schedule unit members to work shifts which include those Sundays covered by its work permit as part of the employees' regular shift, albeit at the increased pay rate demanded by R.I. G.L. § 25–1–6.[2] The Employer further asserts that up until Sunday, November 10, 1974, members of the unit "have worked on Sunday pursuant to the contract when scheduled to do so". (First Amended Complaint Par. 5).

On Sunday, November 10, 1974, members of the unit collectively refused to work the Sunday shift. Pursuant to the provisions of Article XI of the agreement, the Union filed a grievance disputing the Employer's power to schedule Sunday work. Since November 10, Sunday operations at the plant have been performed by supervisory personnel. In response to what it viewed to be a violation of the no-strike clause and the grievance procedures of the agreement, the Employer filed this action in federal district court under § 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), seeking a so-called *"Boys Markets injunction".* Boys Markets v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583,

---

**2.** The Employer claims that the agreement does permit substitutions on *overtime* assignments to accommodate the religious practices of its employees. Collective Bargaining Agreement, Article III, § 2. *Cf.* Civil Rights Act of 1964, 42 U.S.C. §§ 2000e(j), 2000e–2(a). Whether, and to what extent, this provision is applicable to the instant dispute is a matter which must be left to arbitration. *See* discussion *infra* at 292, 293.

26 L.Ed.2d 199 (1970). The Employer contends that each Sunday's cessation of work would result in $98,000.00 in lost production. Further, despite the language in Article XI, § 7(a) of the agreement absolving the Employer of any duty to arbitrate in the face of a work stoppage, the Employer represents that it is nonetheless ready and willing to process the dispute through the grievance and arbitration procedures of Article XI. (First Amended Complaint Par. 10).

■ The Union, of course, disputes the Employer's interpretation of the agreement and contends that it does not authorize the Employer to schedule unit members to Sundays as part of their regular shift. Both parties agree, however, and the Court so finds, that the grievance in question is subject to the mandatory grievance and arbitration procedures outlined in Article XI of the agreement. Whether the contract does indeed empower the Employer to assign Sunday work is a question which must be left to the arbitral process. United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 568–569, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–583, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

The Union, however, contends that even if the agreement were construed to authorize Sunday work, such an agreement would violate both R.I.G.L. § 25–1–6 and the United States Constitution. By its alternative motions, the Union has therefore interposed a number of objections to the issuance of an injunction and the maintenance of the action.[3] For the purpose of determining these

motions, the Court must assume that the collective bargaining agreement does in fact provide for Sunday work assignments in the same manner and with the same sanctions for absenteeism as Monday through Saturday assignments. First, the Union claims that R.I.G.L. § 25–1–6 must be construed to prevent the Employer from enforcing, by way of penalty or discharge, any collective agreement to do Sunday work. However, since § 25–1–6 has never been construed by the state courts, the Union urges this Court to abstain and stay these proceedings pending an authoritative state interpretation of the statute. Third, the Union argues that a contract provision requiring Sunday work would place an impermissible burden on the individual employee's freedom to practice his religion, and thereby violate the First Amendment to the United States Constitution.

## I

Before we can turn to the merits of the Union's defenses, the Court must determine the scope of its review in an action for a *Boys Markets* injunction. In *Boys Markets, supra,* the Supreme Court struck a narrow balance between two conflicting congressional policies: the strong policy against federal courts enjoining labor strikes, as evidenced by the Norris-LaGuardia Act, 29 U.S.C. § 104, versus the equally strong policy to promote peaceful resolution of industrial disputes by enforcing the arbitration and "no-strike/no-lockout" provisions of collective bargaining agreements.[4] LMRA § 301(a), 29 U.S.C. § 185(a). *Boys Markets, supra,* 398 U.S. at 241, 251–253, 90 S.Ct. 1583. The Supreme Court concluded that the Norris-LaGuardia Act does not prevent a federal court from enjoining a work stoppage

---

3. Defendants' motion to dismiss the action against the individual members of Local 2548 as a class for defective service of process is not considered herein.

4. *See* United Steelworkers of America v. American Manufacturing Co., *supra*; United Steelworkers of America v. Warrior & Gulf Navigation Co., *supra*; United Steelworkers

of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) ("Steelworkers Trilogy"); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). *See also* Teamsters Local 174 v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962).

under § 301 of the LMRA in the following limited circumstances:

"A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity— whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance."

*Id.* at 254, 90 S.Ct. at 1594 (emphasis in original) (citation omitted).

All of these considerations have been demonstrated in the case at bar. The work stoppage involves an arbitrable dispute; the Employer has represented its willingness to arbitrate the dispute; and the work stoppage is likely to continue at great economic loss to the Employer. The Court is thus faced with a critical, preliminary question: once it finds that the requirements set forth in *Boys Markets* are met, should an injunction issue so that the dispute can be referred immediately to arbitration, or should the Court first consider the merits of the Union's statutory and constitutional defenses? Two considerations argue in favor of immediate reference. First, the Supreme Court stated quite clearly in the *Steelworkers Trilogy*[5] that judicial interference with the resolution of arbitrable disputes must be narrowly circumscribed. In Steelworkers v. Warrior & Gulf Navigation Co., *supra,* the Supreme Court cautioned:

"[T]o be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made."

*Id.* 363 U.S. at 582, 80 S.Ct. at 1353.

At the same time, we must recognize the long-standing principle of avoidance of constitutional issues when there is a non-constitutional ground upon which the issue may be decided. *See, e. g.,* Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346–347, 56 S.Ct. 466, 80 L.Ed. 688 (Brandeis, J., concurring). In this instance, the constitutional issue would be eliminated by a finding that the agreement does not provide for Sunday work assignments. Since only the arbitrator can make that determination, Steelworkers v. American Mfg. Co., *supra,* 363 U.S. at 568, 80 S.Ct. 1343, immediate reference would seem to be warranted. *Cf.* Railroad Commission of Texas v. Pullman Company, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).[6]

5. Cited in n. 4, *supra.*

6. There appears to be at least a superficial analogy between the principles favoring federal court abstention on uncertain issues of state law and the considerations favoring reference of the dispute at bar to arbitration without first determining the Union's statutory or constitutional defenses. In *Pullman, supra,* the Supreme Court found that since the constitutional adjudication sought therein might be eliminated by a definitive ruling on the state issue, the state claim should be determined first. However, the state courts had not authoritatively passed on the issue. In order to avoid needless friction with state policies and in "scrupulous regard for the rightful independence of the state governments", the Court concluded that the federal court should abstain

▮ Despite these important considerations, the Court concludes that it must first satisfy itself that the employees' statutory and constitutional rights would not be violated by a Sunday work provision before it can issue a *Boys Markets* injunction. The Court bases its conclusion on the language of *Boys Markets* itself, wherein the Court states:

> "[T]he District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity."

*Id.* 398 U.S. at 254, 90 S.Ct. at 1594. One of those equitable principles requires that the probable injury to the plaintiff in the absence of an injunction outweigh the injury to the defendant if the injunction were to be issued. *See* Anheuser-Busch, Inc. v. Teamsters Local No. 633, 511 F.2d 1097 (1st Cir. 1975). In striking such a balance, this Court must assess the strength of the Union's statutory and constitutional claims on behalf of its members to determine whether their rights will be impermissibly infringed by an order to return to work. My conclusion that principles of equity demand that *this* Court review the Union's claims is reinforced by the fact that the collective bargaining agreement expressly removes both the statutory and constitutional defenses raised by the Union from the arbitrator's consideration. Collective Bargaining Agreement, Article XI, § 7(c). Both the scope of the arbitrator's authority to decide and the court's authori-

ty to review that decision are narrowly limited. Alexander v. Gardner-Denver Co., 415 U.S. 36, 53–54, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). As the Supreme Court recently recognized in a slightly different context, the courts should not suppose that the arbitral process will recognize or protect the individual employee's statutory or constitutional rights.

> "[T]he specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581–583, 80 S.Ct. 1347, at 1352–1353, 4 L.Ed.2d 1409 (1960). Parties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations. On the other hand, the resolution of statutory or constitutional issues is a primary responsibility of courts."

Alexander v. Gardner-Denver Co., *supra*, 415 U.S. at 57, 94 S.Ct. at 1024 (footnote omitted).[7]

## II

Although the Union contends that R. I.G.L. § 25–1–6 should be interpreted to prohibit Sunday work assignments under the collective bargaining agreement, the Union argues that such an interpretation should be left to the state courts

from ruling on the issues before it until the state courts had an opportunity to interpret the state law in question. *Id.*, 312 U.S. at 498–501, 61 S.Ct. at 645. Here, the proper interpretation of the collective bargaining agreement is exclusively within the province of the arbitrator. This Court is thus similarly faced with the choice of staying its hands pending a decision by the arbitrator or taking a much more intrusive role into the grievance process by reaching the statutory and constitutional defenses interposed by the Union even though the necessity for such a determination would be eliminated by an arbitrator's award upholding the Union's position.

However, even if this analogy holds true, one must recall, as discussed *infra* at 295, that abstention is an equitable doctrine to be applied in narrowly limited circumstances. For reasons which follow, I conclude that equitable considerations do mandate examination of the merits of the Union's defenses.

7. The fact that the individual employees would not be barred by an adverse arbitral award from asserting their First Amendment claims in a subsequent suit under Title VII of the Civil Rights Act of 1964, 42 U. S.C. § 2000e et seq., Alexander v. Gardner-Denver Co., *supra*, cannot be interpreted to justify this Court, sitting in equity, to ignore the claims as premature.

to make. It therefore urges the Court to apply the judicial principle of abstention and stay these proceedings.

In determining whether abstention is appropriate, the Court is guided by the Supreme Court's careful review of its past decisions on abstention in Lake Carriers' Association v. MacMullen, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). There the Court observed:

> "Abstention is a judge-made doctrine . . ., first fashioned in 1941 in Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971, [that] sanctions . . . escape [from immediate decision] only in narrowly limited 'special circumstances,' Propper v. Clark, 337 U.S. 472, 492, 69 S.Ct. 1333, 1334, 93 L.Ed. 1480; Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444 (1967), justifying 'the delay and expense to which application of the abstention doctrine inevitably gives rise.' England v. Medical Examiners, 375 U.S. 411, 418, 84 S.Ct. 461, 466, 11 L.Ed.2d 440 (1964).
>
> * * * * * *
>
> " . . . The paradigm case for abstention arises when the challenged state statute is susceptible of 'a construction by the state courts that would avoid or modify the [federal] constitutional question. Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152. Compare Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377.' Zwickler v. Koota, supra, 389 U.S. at 249, 88 S.Ct. 396. More fully, we have explained:
>
> > 'Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication. . . . The doctrine . . . contemplates that defer-

ence to state court adjudication only be made where the issue of state law is uncertain.' Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965)."

Id., 406 U.S. at 509, 510–511, 92 S. Ct. at 1756. *See also* Harris County Commissioners Court v. Moore, 420 U.S. 77, 95 S.Ct. 870, 43 L.Ed. 2d 32 (1975).

With these principles in mind, we turn to the statute itself. Although the statute has never been interpreted by the courts of Rhode Island, the parties have no dispute over many of its relevant provisions. First, all agree that § 25-1-6 generally prohibits work on Sundays, with such exceptions as are not here relevant. Second, § 25-1-6 empowers the State Director of Labor to issue Sunday work permits under certain specified conditions. The holder of such a permit can lawfully operate his business on specified Sundays and can employ workers in connection therewith. These workers must be paid at a rate which is at least one and a half times their regular wage. It is undisputed that the Employer is lawfully operating its plant on Sundays pursuant to a valid permit. As discussed above, for purposes of these motions, it is assumed that under the collective bargaining agreement presently in effect, the employees have voluntarily agreed to work on Sundays when so assigned by the Employer.

■ In dispute is the proper interpretation of the following language:

> "provided further that nothing herein shall be a ground for discharge or other penalty upon any employee for refusing to work [on Sundays]."

R.I.G.L. § 25-1-6.

The Union does not appear to argue that an individual employee can never waive this protection of § 25-1-6. Unlike the mandatory language of § 25-1-6 requiring "time and a half" pay, this protection, by its very nature, presupposes the possibility of waiver. The Union thus acknowledges that an individual who vol-

unteers on Saturday to work the following Sunday exposes himself to penalty or discharge if he inexcusably fails to show up for work on Sunday as promised. Any other reading of this protection would make the value of the work permit depend on the whim or fancy of the permit holder's employees and would make this right more absolute than the most hallowed freedoms guaranteed by the Bill of Rights and the Fourteenth Amendment.[8] Cf. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

■■■ In essence, the Union contends that the right to refuse Sunday work is conferred by § 25–1–6 on each individual worker and cannot be bargained away by a majority of the employees acting through their collective bargaining agent, the Union. The issue thus framed, it is clear that abstention is inappropriate. The reasons for this conclusion are manifold. Preliminarily, the Court would point out that the instant action is peculiarly founded in national labor law. Although a § 301(a) action may be brought in state court, Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962), the state court must apply principles of national labor law, Teamsters Local 174 v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). In addition, § 301(a) suits brought in state court may be removed to federal court under 28 U.S.C. § 1441. Avco Corp. v. Aero Lodge 735, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968). The strong preference for a uniform, national labor policy as expressed in these decisions must take precedence over the quest to avoid needless state-federal friction which underlies the abstention doctrine.

Abstention is thus inappropriate since the only ambiguity presented by § 25–1–6 would have to be resolved by the state courts within the limits of controlling precepts of federal labor law. Lucas Flour, supra. The provision disputed herein can be interpreted in one of two ways; one, that it can be waived in a collective bargaining agreement; or two, that it can be waived only by each individual employee. If the former interpretation is correct, the collective waiver was valid. The Union is then left with its First Amendment claim. However, even if the second interpretation were to prevail, the Union nonetheless would be unable to rely on the state statute, since the provision, so construed, would impermissibly conflict with controlling federal labor law in the following respect. See Lucas Flour, supra. Cf. Motor Coach Employees v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). According to the Union, the provision would operate to invalidate a collective agreement to perform Sunday work. However, since an individual agreement would be valid and enforceable, the Employer would be forced to bypass the employees' exclusive bargaining agent, on the mandatory bargaining subjects of wages and hours, in an attempt to secure individual employment contracts with its employees, all in violation of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 et seq.[9] Thus, such a provision could be upheld only if federal labor policy also

8. Apparently reversing its earlier position, the Union at oral argument adopted the more extreme position that § 25–1–6 denies an employer any recourse against an employee who inexcusably refuses to work on a Sunday after he had individually and voluntarily agreed to do so. This Court is firmly convinced that no court would interpret § 25–1–6 to produce such an illogical and unfair result. Cf. Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965). The Rhode Island Supreme Court has repeatedly stated that "[n]o statute should be construed to bring about a patently inane result; moreover, we have often said the legislature could never be presumed to have intended to enact laws which are absurd, unjust or unreasonable. State v. Haggerty, 89 R.I. 158, 151 A.2d 382." Wilkinson v. Harrington, 104 R.I. 224, 239, 243 A.2d 745, 753 (1968). See also Deignan v. Cowan Plastic Products Corp., 99 R.I. 193, 197, 206 A.2d 534 (1965).

9. See, e. g., Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); N. L. R. B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d

held the right to refuse Sunday work to be exclusively that of the individual employee. *Lucas Flour, supra.* Viewed in this light, abstention is clearly not warranted.[10]

### III

The Union next argues that under federal law, it could not bargain away the statutorily guaranteed right of its members. The cases it cites stand, however, for the more limited proposition that the Union cannot agree, on behalf of its members, to do something which is prohibited by law, *e. g.,* to discriminate on the basis of race, color, religion, sex or national origin,[11] or to accept less than the minimum wage guaranteed by the Fair Labor Standards Act,[12] 29 U.S.C. § 201 et seq. On the other hand, it is clear that a union can agree to forego other statutory and constitutional rights, such as the right to strike,[13] and the right not to join a

union,[14] where the consequent agreement is enforceable at law.

We thus appear to have travelled full circle back to our original question. Assuming, as we must, that state law permits the Employer to operate on Sundays and that the contract permits the Employer to assign its employees to Sunday work, is it lawful for the Employer to penalize those employees who refuse to work on Sundays? As to those workers who refuse on nonreligious grounds, the protection of § 25–1–6 must be viewed to be waived by the collective bargaining agreement, lest the state statute succumb to overriding federal labor policies. *Ante* at 296. Furthermore, as the Union concedes, § 25–1–6 can afford no greater protection to those employees objecting to Sunday work on religious grounds, since § 25–1–6 must be viewed to be part of a non-sectarian, statutory scheme to provide a uniform day of rest,

230 (1962) ; N. L. R. B. v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S. Ct. 718, 2 L.Ed.2d 823 (1958) ; May Stores Co. v. N. L. R. B., 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145 (1945) ; J. I. Case Co. v. N. L. R. B., 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944). *See also* N. L. R. B. v. Sonics Corp., 312 F.2d 610, 615 (1st Cir. 1963). *See generally* N. L. R. B. v. Allis-Chalmers Manufacturing Co., 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967).

10. Two other considerations argue against abstention. First, to the extent that the Union's claim that this allegedly unwaivable protection of § 25–1–6 simply constitutes a statutory incorporation of the Free Exercise Clause of the First Amendment, this Court is certainly competent to determine its proper scope. *See* Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). *Cf.* Harris County Commissioners Court v. Moore, *supra,* 420 at 84, n. 8, 95 S.Ct. 870, 876.
Second, at oral argument the Union conceded that it was reluctant to urge the Court to abstain since it agreed with the Employer that the delay thereby entailed would seriously jeopardize the negotiations for a new contract which were currently at a standstill over the very question of the validity of a collective waiver of the employees' right under R.I.G.L. § 25–1–6 to refuse to work on Sundays. Both the Employer and the Union advised the Court that if that question were

not resolved in the context of the instant action, the parties would not be able to negotiate a new contract, thereby ensuring a work stoppage when the present contract expired on March 2, 1975. As a result, the instant motions were heard on an expedited basis. *See* n. 1, *supra.* Similarly, one can only conclude that, under the circumstances, the cost of abstaining to the litigants and to federal labor policy, *see* 29 U.S.C. § 151, would far exceed its value. *See* Harman v. Forssenius, *supra;* England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 423, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) (Douglas, J., concurring).

11. *See, e. g.,* Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) ; Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979 (1973) ; Tuma v. American Can Co., 373 F.Supp. 218 (D.N.J.1974).

12. *See, e. g.,* Mitchell v. Barbee Lumber Co., 35 F.R.D. 544 (S.D.Miss.1964).

13. *See, e. g.,* Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 279, 280, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

14. *See, e. g.,* Railway Employees' Department v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956) ; Linscott v. Millers Falls Co., 440 F.2d 14 (1st Cir. 1971), cert. denied, 404 U.S. 872, 92 S.Ct. 77, 30 L.Ed.2d 116.

lest it succumb to the First Amendment prohibitions of the Establishment Clause. *See* McGowan v. Maryland, 366 U.S. 420, 453, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). The issue, thus reduced, leaves this question: does the Sunday work requirement unconstitutionally burden the First Amendment rights of the employees to observe their religion?

### A

■ The Employer initially argues that the First Amendment question is not properly before the Court because the issue is the product of neither state nor federal action, but stems rather from a private agreement. This contention must be rejected on two interrelated grounds. First, even if no governmental action were involved, the Employer has come to this Court seeking equitable relief. The time-honored principle that "one who seeks equity must come with clean hands" requires that the Court determine whether the Employer seeks to enforce an agreement which, if secured by government, would violate an individual's constitutional rights. *See* 11 Wright & Miller, Federal Practice and Procedure: Civil § 2946 (1973).

Second, and more importantly, I find the requisite government action furnished by this Court's action, under the reasoning of Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). In *Shelley*, the Supreme Court held that a private agreement which would be unconstitutional if entered into by the state was valid, so long as its terms were voluntarily adhered to by the private parties. The Court concluded, however, that any attempt to seek judicial

enforcement of the agreement would sufficiently involve the state in an unconstitutional activity so as to preclude enforcement. Both the Supreme Court and the First Circuit have acknowledged the applicability of *Shelley* to the enforcement of a collective bargaining agreement. Railway Employers' Department v. Hanson, 351 U.S. 225, 232 n. 4, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); Linscott v. Millers Falls Co., 440 F.2d 14 (1st Cir. 1971), cert. denied, 404 U.S. 872, 92 S.Ct. 77, 30 L.Ed.2d 116.[15] Cf. Buckley v. American Fed. of Television & Radio Artists, 496 F.2d 305, 310 (2d Cir. 1974), cert. denied, 419 U.S. 1093, 95 S.Ct. 688, 42 L.Ed.2d 687 (1974).

### B

■ We start our consideration of the Union's Free Exercise claim with the proposition that an organization has standing to raise the rights of its members. N.A.A.C.P. v. Button, 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). The Union asserts that some or all of its members, in keeping with their religious beliefs, view Sunday as a day for religious observance and, on this basis, decline to work on Sundays. Thus, if the Court were to issue an injunction prohibiting the work-stoppage and ordering a return to work, it would force those employees to choose between their jobs and their religious beliefs.

Taking the Supreme Court's decision in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), as our frame of reference, it is clear that the collective bargaining agreement, as enforced by a court injunction and order to arbitrate, would impose a burden on

15. In *Linscott, supra*, a majority of the court went beyond the *Shelley* rationale to find federal action solely in the LMRA's approval of a union shop agreement. The matter had been brought before the court to invalidate the private action of an employer, in compliance with a collective bargaining contract establishing a union shop, in discharging the plaintiff for refusing to join the union. Although disputing the majority's conclusion that § 14(b) of the LMRA provided the requisite federal action to trigger plaintiff's

constitutional claim, Judge Coffin agreed with the majority, in principle, that:

"Should a party seek to enforce any agreement discriminating against the exercise of a person's constitutional rights, courts would, under Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), simply not enforce it."

*Id.* 440 F.2d at 20. *Cf.* Lavoie v. Bigwood, 457 F.2d 7, 11–12 (1st Cir. 1972) (Coffin, J.)

the free exercise of the objecting employees' religion. In *Sherbert,* the Supreme Court declared:

" '[I]f the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect.' Braunfeld v. Brown, supra, 366 U.S. at 607, 81 S.Ct., at 1148. Here, not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship."

*Id.* 374 U.S. at 404, 83 S.Ct. at 1794.

■ Although the right to practice one's religion is not absolute,[16] Cantwell v. Connecticut, 310 U.S. 296, 303–304, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), once an infringement of an individual's free exercise right has been demonstrated, the offending provision cannot be upheld unless it is justified by a compelling governmental interest. *Sherbert, supra,* 374 U.S. at 406, 83 S.Ct. 1790. *Linscott, supra,* 440 F.2d at 17. In *Sherbert* itself, the plaintiff was a Seventh-day Adventist who had been discharged from her job because she refused, on religious grounds, to work on Saturdays.[17] Unable to secure other employment not requiring Saturday work, she applied for unemployment compensation. The State denied her application on the ground

that she had refused to accept "available" work. Concluding that this ruling penalized plaintiff for practicing her religion, the Supreme Court held that the proffered state interest, to save money by preventing spurious claims, was neither compelling nor factually supported by the record. Unlike the burden imposed by the Sunday closing laws in Braunfeld v. Brown, 366 U.S. 599, 81 S. Ct. 1144, 6 L.Ed.2d 563 (1961), which made the practice of Orthodox Jewish religious beliefs "more expensive", plaintiff in *Sherbert* was more "directly" burdened by the absolute denial of physical sustenance. *Sherbert, supra,* 374 U.S. at 407–408, 83 S.Ct. 1790. *Cf. Linscott, supra,* 440 F.2d at 18.

The First Circuit found this distinction critical in Linscott v. Millers Falls Company, *supra.* Plaintiff in *Linscott* was a Seventh-day Adventist whose religion forbade her from contributing financial or other support to any union. When the company at which she worked entered into a union shop agreement with the certified bargaining agent, she refused to pay dues and fees to the union on religious grounds. As a result, she was discharged.

In applying the *Sherbert* rationale to the plaintiff's situation, the First Circuit in *Linscott* found two crucial distinctions. First, like the merchants in *Braunfeld, supra,* and the employees in the case at bar, plaintiff Linscott's burden was not as severe as Sherbert's.

"[Linscott's] alternative is not absolute destitution. The cost to her is being forced to take employment in a nonunion shop—here, less remunerative employment." *Id.* at 18. *See also* Yott v. North American Rockwell Corp., 501 F.2d 398, 404 (9th Cir. 1974).

Similarly, the employees in the case at bar are forced to make no greater com-

---

**16.** *See, e. g.,* Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878). *Cf.* Cap Santa Vue, Inc. v. N. L. R.

B., 137 U.S.App.D.C. 395, 424 F.2d 883, 886–887 (1970).

**17.** The propriety of that action was not considered by the Supreme Court.

promise in their religious convictions than are, for example, their Jewish co-workers who did not enjoy the protection of R.I.G.L. § 25–1–6 in the first place. *Cf. Sherbert, supra,* 374 U.S. at 406, 83 S.Ct. 1790. Their choice is strictly between their Sunday religious observance and another job. The Supreme Court's decision in *Sherbert* leaves no doubt that these employees could not be denied unemployment compensation in the event no suitable job was available.

Second, the First Circuit in *Linscott* concluded that, unlike the state's interest in *Sherbert,* "the public and private interests in collective bargaining and industrial peace" as embodied in the federal labor laws and the congressionally supported principle of the union shop, were compelling justification for the burden placed on plaintiff's religious practices. *Accord* Gray v. Gulf, Mobile & Ohio RR., 429 F.2d 1064 (5th Cir. 1970), cert. denied, 400 U.S. 1001, 91 S. Ct. 461, 27 L.Ed.2d 451. *See also* Yott v. North American Rockwell Corp., *supra*; Hammond v. United Papermakers & Paperworkers Union, 462 F.2d 174 (6th Cir. 1972), cert. denied, 409 U.S. 1028, 93 S.Ct. 464, 34 L.Ed.2d 322.

 The Court is persuaded that the First Circuit's analysis in *Linscott* controls the case at bar. Here a majority of the employees of the unit, acting through the Union, agreed to waive a state protection by voluntarily agreeing to do Sunday work. The Court must assume that in bargaining away this right, the Union members received valuable concessions from the Employer in return. There is no evidence that the agreement is phrased or applied in any but a religiously neutral fashion. In addition, the Employer is charged by the Civil Rights Act of 1964 to make reasonable accommodation to the religious practices of its employees. 42 U.S.C. § 2000e(j). *Cf.* 42 U.S.C. § 2000e–2(a), (c).

Thus we are faced with the situation where a minority group of employees[18] seeks to nullify the force and effect of a collective bargaining agreement on the basis of their individual religious preferences.[19] It can hardly be disputed that such a ruling would seriously jeopardize our national labor policy to encourage the practice and procedure of collective bargaining as the best means to promote peaceful resolution of industrial disputes and thereby eliminate the causes of "substantial obstructions to the free flow of commerce". 29 U.S. C. § 151. A ruling on behalf of the objecting employees here would furnish the grounds for all employees of varying religious preferences to "opt out" of the otherwise controlling terms of the collective bargaining agreement at will and with impunity. In such a situation, the Employer could hardly be expected to rely on the provisions of the contract it had negotiated in planning its day-to-day operations. The value of the agreement would thus be abrogated. Fashioning such an exception to the operation of a collective bargaining agreement would endanger the entire principle of majority rule which, as the Supreme Court recently reaffirmed, is "[c]entral to the policy of fostering collective bargaining".

". . . If the majority of a unit chooses union representation, the NLRA permits them to bargain with

---

18. In determining the Free Exercise Claim, the Court must assume that, in ratifying the agreement, the majority of employees knowingly waived the protection of R.I.G.L. § 25–1–6.

19. In addition, even assuming *arguendo* that the Union's First Amendment arguments were to prevail, the Court fails to see how such a conclusion would support the Union's motion to dismiss or a denial of a *Boys*

*Markets* injunction since it would not affect the validity of the contractual provision, but would rather require that any injunction include an exemption to its general application for those employees refusing to work on Sundays on religious grounds. Factually, however, this presumptive "minority", *see* n. 18 *supra,* appears to include virtually the entire Union membership, so that permitting such an exemption would effectively destroy the value of any injunction limited by it.

their employer to make union membership a condition of employment, thereby imposing their choice upon the minority. 29 U.S.C. §§ 157, 158(a)(3). In establishing a regime* of majority rule, Congress sought to secure to all members of the unit the benefits of their collective strength and bargaining power, in full awareness that the superior strength of some individuals or groups might be subordinated to the interest of the majority. Vaca v. Sipes, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967); J. I. Case Co. v. NLRB, 321 U.S. 332, 338–339, 64 S.Ct. 576, 580, 88 L.Ed. 762 (1944); H.R.Rep.No.972, 74th Cong., 1st Sess., 18, II Leg.Hist. of the NLRA 2974 (1935). As a result, '[t]he complete satisfaction of all who are represented is hardly to be expected.' Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L. Ed. 1048 (1953).

The Court most recently had occasion to re-examine the underpinnings of the majoritarian principle in NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967). In that case [we stated] : . . .

> 'National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions. The policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees. . . .'

388 U.S., at 180, 87 S.Ct. at 2006 (footnotes omitted).

In vesting the representatives of the majority with this broad power Congress did not, of course, authorize a tyranny of the majority over minority interests. First, it confined the exercise of these powers to the context of a ' "unit appropriate" for the purposes of collective bargaining,' i. e., a group of employees with a sufficient commonality of circumstances to ensure against the submergence of a minority with distinctively different interests in the terms and conditions of their employment. *See* Allied Chemical Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 171, 92 S.Ct. 383, 393, 30 L.Ed.2d 341 (1971). Second, it undertook in the 1959 Landrum-Griffin amendments, 73 Stat. 519, to assure that minority voices are heard as they are in the functioning of a democratic institution. Third, we have held, by the very nature of the exclusive bargaining representative's status as representative of *all* unit employees, Congress implicitly imposed upon it a duty fairly and in good faith to represent the interests of minorities within the unit. Vaca v. Sipes, *supra*; Wallace Corp. v. NLRB, 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216 (1948); cf. Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S. Ct. 226, 89 L.Ed. 173 (1944)."

Emporium Capwell Company v. Western Addition Community Organization, 420 U.S. ——, 61–65, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975) (footnotes omitted).

This Court must therefore conclude that Congress' overriding concern for the viability of the collective bargaining process, with its built-in protections for minorities, is so compelling as to justify the incidental burden that Sunday work assignments place on the individual employees' right to practice their religion. *Linscott, supra. See also* Gray v. Gulf, Mobile & Ohio RR., *supra. Cf.* Cap Santa Vue v. N. L. R. B., 137 U.S.App. D.C. 395, 424 F.2d 883 (1970).

Accordingly, the Union's motions to dismiss or to stay are denied.