Donald Frederick JENSEN, Jack S. Warriner, Paula Chambers, Sharon Dumas, Ann Kondo Corum, Van E. Corum, Joanne C. Kapahua, Harold W. Kuha, Linda M. McLean, Florence M. Hayslip, Harry Marshall Greenwood, Deborah M. C. Chu, E. Paul Vosburgh, Jerelene M. Aio, Plaintiffs,

v.

Noboru YONAMINE, Darrow L. K. Aiona, George S. Adachi, Richard E. Ando, Hubert P. Minn, Marion Saunders, Ruth Tabrah, Howard I. Takenaka, Hiroshi Yamashita, Individually and as members of Hawaii State Board of Education, and Albert Miyasato, Individually and as Superintendent of Education, Hawaii State Teachers Association, an unincorporated association, Hawaii Education Association, an unincorporated association, National Education Association, an unincorporated association, Defendants.

Civ. No. 75-405.

United States District Court,
D. Hawaii.

Aug. 22, 1977.

Jared H. Jossem, Roger W. Fonseca, Honolulu, Hawaii, for Nat. Right to Work Legal Defense Foundation, Inc.

Rex H. Reed, Fairfax, Va., Edwin Vierra, Silver Spring, Md., Michael E. Merrill, Edith D. Hakola, Fairfax, Va., for plaintiffs.

Thomas P. Gill, Honolulu, Hawaii, for Hawaii State Teachers Assn. & Natl. Ed. Assn.

James T. Paul, Honolulu, Hawaii, for Hawaii Ed. Assn.

Ronald Y. Amemiya, Atty. Gen., Charlotte E. Libman, Deputy Atty. Gen., Honolulu, Hawaii, for defendants.

## MEMORANDUM AND ORDER

### I. BACKGROUND

WONG, District Judge.

In May 1971, the Hawaii State Teachers Association (HSTA) was certified as the exclusive bargaining representative for the bargaining unit composed of the public school teachers in the State of Hawaii pursuant to Chapter 89 of the Hawaii Revised Statutes (HRS). On or about October 27, 1971, the Hawaii Public Employment Relations Board (HPERB)[1] certified a $77 service fee as authorized by HRS § 89–4 (Supp.1975).[2] Since that date a service fee, in varying amounts, has been certified and charged pursuant to HRS § 89–4(a).

The plaintiffs are public school teachers employed by the defendant Board of Education, Department of Education, State of Hawaii (Board). The plaintiffs initiated this class action on December 3, 1975. The suit challenges the constitutionality of the mandatory service fee deducted from their wages by the Board and given to the HSTA pursuant to HRS § 89–4(a). Jurisdiction in this court is premised upon 28 U.S.C. § 1343(3) for a cause of action asserted under 42 U.S.C. §§ 1983, 1985(3), and 1986.

---

1. The HPERB was created by HRS § 89–5 (Supp.1975) to, *inter alia,* investigate and resolve disputes concerning collective bargaining in public employment under Chapter 89 of the HRS.

2. HRS § 89–4 provides that

(a) The employer shall, upon receiving from an exclusive representative a written statement which specifies an amount of reasonable *service fees necessary to defray the costs for its services rendered in negotiating and administering an agreement* and computed on a pro rata basis among all employees within its appropriate bargaining unit, deduct from the payroll of every employee in the appropriate bargaining unit the amount of service fees and remit the amount to the exclusive representative . . . .

(b) *In addition* to any deduction made to the exclusive representative under subsection (a), the employer shall, upon written authorization by an employee, deduct from the payroll of the employee the amount of *membership dues,* initiation fees, group insurance premiums, and other association benefits and shall remit the amount to the employer organization designated by the employee.
(Emphasis added.)
The service fee in HRS § 89–4(a) is separate from membership dues for employee organizations under HRS § 89–4(b).

The plaintiffs claim that their rights under the First, Ninth, Tenth, and Fourteenth Amendments to the United States Constitution and sections 2, 3, and 4 of Art. 1 of the Constitution of the State of Hawaii have been violated.

The plaintiffs are not nor do they desire to become members of the HSTA, the Hawaii Education Association (HEA), or the National Education Association (NEA).[3] Neither do they desire to be represented by any of these organizations. The plaintiffs allege that their constitutional rights have been violated because the service fees automatically deducted from their wages have been, are being, and will continue to be used for purposes unrelated to the negotiation and administration of the collective bargaining agreement (hereinafter referred to as "political purposes").[4] The plaintiffs seek to represent all public school teachers of a similar persuasion.[5]

The complaint charges that the Board, acting under HRS § 89–4, deducts monies from the plaintiffs' wages. Such funds are transferred to the HSTA. The HSTA, in turn, forwards substantial portions of those monies to the HEA and the NEA. The forced deduction is said to be a condition of continued employment.[6]

The plaintiffs allege that expenditures are made for "political purposes" with the knowledge of the Board and the defendant Superintendent of Education. The plaintiffs say that they have complained to the Board and the HSTA of the compulsory deductions and have transmitted copies of their protests to the HSTA.

The complaint seeks damages, declaratory relief, and an accounting as to the specific purposes to which the fees are applied, as required by HRS § 89–15 (Supp.1975).

The HSTA, the HEA, and the NEA are named as defendants. Also named as defendants are the Superintendent of Education and the members of the Board (hereinafter collectively referred to as "the individual defendants"). The defendants have responded to the complaint as follows:

1. The HSTA and the NEA have moved to dismiss the complaint for failure to state a claim upon which relief can be granted (Fed.R.Civ.P. 12(b)(6)).

2. The HEA has moved for summary judgment.

3. The individual defendants have moved to dismiss the complaint for lack of subject matter jurisdiction (Fed.R.Civ.P. 12(b)(1)) and for failure to state a claim upon which relief can be granted.

## II. DISCUSSION

### A. *Subject matter jurisdiction*

■ The plaintiffs have alleged federal jurisdiction under 28 U.S.C. § 1343(3). They assert a cause of action under the United States Constitution, the Hawaii Constitution, and federal statutes. This court has jurisdiction over the federal claims. There is pendent jurisdiction over the state claims.

---

3. The HEA was an affiliate of the NEA, a national organization. That affiliation was terminated in 1971. On January 1, 1971, the HEA reorganized by creating three entities: the HSTA, the HSEOA (unit for education officers), and the CUPA (unit for University of Hawaii faculty). The HEA has continued in existence.

4. The plaintiffs claim that the monies from the service fees are used to, *inter alia,* support' political campaigns of candidates for political office; for lobbying efforts; to propagate certain political and economic doctrines; to support activities limited to members of the defendant organizations; and to support strikes and boycotts against public employers. Complaint ¶ 20.

5. The class has not been certified; no motion to certify the class has been filed to date. Although the matter is not before the court at this time, the class allegations in the complaint are insufficient. The allegations meet the requirements of Fed.R.Civ.P. 23(a), but are devoid as to the requirements of Fed.R.Civ.P. 23(b).

6. The court need not address this allegation at this time. It should be noted, however, that since the Board deducts the amount of the service fee from a teacher's wages, an objecting teacher cannot voluntarily withhold payment of the service fee.

### B. *42 U.S.C. § 1985(3)*

■ One of the plaintiffs' claims is an alleged violation of 42 U.S.C. § 1985(3).[7] An allegation of a conspiracy is vital to a § 1985(3) action. *Rincon Band of Mission Indians v. County of San Diego,* 495 F.2d 1, 11 (9th Cir. 1974). The HSTA and the NEA contend that the plaintiffs have failed to allege a conspiracy.

The plaintiffs respond that the term "conspiracy" need not necessarily be used. They say they have alleged that the defendants have participated in a continuing process whereby the plaintiffs' constitutional rights are being violated.

■ Notwithstanding that the term "conspiracy" need not be used, the plaintiffs have not alleged that the defendants acted together to violate the plaintiffs' constitutional rights. The complaint does not allege a conspiracy, collusion, agreement, or other similar arrangement by the defendants. Therefore, it does not properly state a § 1985(3) action.

### C. *Failure to state a claim*

The HSTA, the NEA, and the individual defendants contend that the complaint fails to state a claim upon which relief can be granted because HRS § 89-4 is constitutional. Following a hearing, the court took the matter under advisement pending a decision by the United States Supreme Court in *Abood v. Detroit Board of Education,* a case presenting the identical issue. The Supreme Court issued its decision in *Abood* on May 23, 1977. *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). *Abood* resolves a major issue in this litigation, but it is not dispositive of this case.

### 1. *Abood*

#### a. *Background*

*Abood* involved the public school teachers employed by the Detroit Board of Education. The Detroit Federation of Teachers (Union) was selected as the teachers' exclusive bargaining representative. A collective bargaining agreement covering the period from July 1, 1969 until July 1, 1971 provided that every teacher was to pay a service charge equal to the regular dues required of Union members. 97 S.Ct. at 1787-88. Failure to pay the service charge could result in discharge. *Id.* at 1788.

Some teachers brought an action in the state court challenging the agency-shop clause of the collective bargaining agreement (hereinafter referred to as "the teachers' case"). The trial court dismissed the action for failure to state a claim. The plaintiffs appealed. While the appeal was pending, the Michigan Supreme Court ruled that Michigan law prohibited an agency shop in the public sector. *Smigel v. Southgate Community School Dist.,* 388 Mich. 531, 202 N.W.2d 305 (1972). Judgment in the teachers' case was vacated and the case remanded. 97 S.Ct. at 1788.

Meanwhile, Abood had filed an identical action as the teachers' case in the same trial court. The *Abood* case had been stayed pending disposition of the first appeal. Upon remand of the teachers' case, the two cases were consolidated. *Id.* at 1788-89.

In 1973, the Michigan legislature enacted a law expressly authorizing the agency shop in the public sector. The trial court granted the defendant's motion for summary judgment.[8] The court gave retroactive effect to the new statute, thus validating the pre-1973 agency-shop clause, and ruled that the clause did not violate the United States Constitution. *Id.* at 1789.

---

**7.** 42 U.S.C. § 1985(3) provides that

> If two or more persons in any State . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . [then] the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

**8.** In Michigan practice, a motion for summary judgment is the equivalent of a motion to dismiss for failure to state a claim upon which relief can be granted in the federal courts.

The Michigan Court of Appeals ruled that the trial court had erred in giving retroactive effect to the 1973 act, but upheld the facial constitutionality of the agency-shop clause based upon *Railway Employees' Department v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956). The Michigan Supreme Court denied review. An appeal to the United States Supreme Court was taken.

b. *The Supreme Court decision*

The Supreme Court said that

[c]onsideration of the question whether an agency shop provision in a collective-bargaining agreement covering governmental employees is, as such, constitutionally valid must begin with two cases in this Court that on their face go far towards resolving the issue.

97 S.Ct. at 1790. The two cases are *Hanson, supra,* and *International Association of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961).

The agency-shop provision of the Railway Labor Act, 45 U.S.C. § 152, Eleventh, was the topic of inquiry in *Hanson.* The Court found the provision constitutional because Congress had determined that a union and employer could conclude an agreement requiring employees who obtain the benefit of union representation to share in its cost because it would promote peaceful labor relations. 351 U.S. at 225, 76 S.Ct. 714; *Abood,* 97 S.Ct. at 1791. The agreement did not violate the First Amendment by requiring that all who benefit from it support the representative financially. 351 U.S. at 238, 76 S.Ct. 714; *Abood,* 97 S.Ct. at 1791.

In *Hanson,* there was no evidence that the union dues were used to "force ideological conformity or otherwise to impair the free expression of employees." *Abood,* 97 S.Ct. at 1791. In fact, the Court said:

If "assessments" are in fact imposed for purposes not germane to collective bargaining, a different problem would be presented.

. . . . .

But that problem is not presented by this record. Congress endeavored to safeguard against that possibility by making explicit that no conditions to membership may be imposed except as respects "periodic dues, initiation fees, and assessments." If other conditions are in fact imposed, or if the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment, this judgment will not prejudice the decision in that case.

351 U.S. at 235, 238, 76 S.Ct. at 720–721 (footnote omitted).

In *Street,* the same agency-shop clause was attacked; however, the plaintiffs there alleged that

the money each was compelled to pay to hold his job was in substantial part used to finance the campaigns of candidates for federal and state officers whom he opposed, and to promote the propagation of political and economic doctrines, concepts and ideologies with which he disagreed.

367 U.S. at 744, 81 S.Ct. at 1787.

The Supreme Court responded that

[t]he record in this case is adequate to present the constitutional questions reserved in Hanson. These are questions of the utmost gravity. However, the restraints against unnecessary constitutional decisions counsel against their determination unless we must conclude that Congress, in authorizing a union shop under § 2, Eleventh, also meant that the labor organization receiving an employee's money should be free, despite that employee's objection, to spend his money for political causes which he opposes. Federal statutes are to be so construed as to avoid serious doubt of their constitutionality.

*Id.* at 749, 81 S.Ct. at 1790.

The Court held that the use of compulsory union dues for political purposes which employees oppose violated the Railway Labor Act. It did not reach the constitutional issue. *Id.* at 749–50, 81 S.Ct. 1784.

In *Abood,* the Supreme Court reiterated that the principle of an exclusive union representative is well recognized by the Congress and the Court. 97 S.Ct. at 1792. The legislature of the State of Hawaii adopted that principle for the public employees of the State of Hawaii. HRS § 89–8 (Supp.1975). It is part of the legislature's recognition "that it is the public policy of the State to promote harmonious and cooperative relations between government and its employees and to protect the public by assuring effective and orderly operations of government." HRS § 89–1 (Supp.1975).

The Supreme Court noted in *Abood,* however, that

[t]he designation of a union as exclusive representative carries with it great responsibilities. The tasks of negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances are continuing and difficult ones. They often entail expenditure of much time and money. The services of lawyers, expert negotiators, economists, and a research staff, as well as general administrative personnel, may be required. Moreover, in carrying out these duties, the union is obliged "fairly and equitably to represent all employees, . . . union and nonunion," within the relevant unit. A union-shop arrange-

ment has been thought to distribute fairly the costs of those activities among those who benefit, and it counteracts the incentive that employees might otherwise have to become "free riders"—to refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees.

97 S.Ct. at 1792–93 (citations and footnote omitted).

The Court upheld the agency-shop clause on its face. *Id.* at 1793. The Court recognized that an agency-shop clause and compulsory fees have an impact upon employees' First Amendment rights. That interference was justified in *Hanson* and *Street* because of the unique status given to labor relations and Congress' regulation of interstate commerce. *Id.*

In *Abood,* the Court extended *Hanson* and *Street* to the case before it.[9] The Court noted that the National Labor Relations Act leaves regulation of the labor relations of state and local governments to the states. *Id.;* 29 U.S.C. § 152(2). Michigan had chosen to establish the right to bargain collectively for employees of local governmental units. Similarly, the legislature of the State of Hawaii has decided that public school teachers can bargain collectively. Hence, *Abood* is dispositive of the question of the facial constitutionality of HRS § 89–4.

9. Justice Powell, joined by Chief Justice Burger and Justice Blackmun, concurred in the judgment in *Abood.* 97 S.Ct. at 1804. One of their points of contention was that there is a distinction between public sector and private sector unions and that *Hanson* and *Street* only dealt with the latter. *Id.* at 1805–07. Of the difference, the majority said:

Public employees are not basically different from private employees; on the whole, they have the same sort of skills, the same needs, and seek the same advantages. . . . The very real differences between exclusive agent collective bargaining in the public and private sectors are not such as to work any greater infringement upon the First Amendment interests of public employees. A public employee who believes that a union representing him is urging a course that is unwise as a matter of public policy is not barred from expressing his viewpoint. Besides vot-

ing in accordance with his convictions, every public employee is largely free to express his views, in public or private, orally or in writing. With some exceptions not pertinent here, public employees are free to participate in the full range of political activities open to other citizens. . . .

There can be no quarrel with the truism that because public employee unions attempt to influence governmental policymaking, their activities—and the views of members who disagree with them—may be properly termed political. But that characterization does not raise the ideas and beliefs of public employees onto a higher plane than the ideas and beliefs of private employees. . . .

The differences between public and private sector collective bargaining simply do not translate into differences in First Amendment rights. . . .

*Id.* at 1796–98 (footnote omitted).

*Abood,* however, goes beyond the constitutional challenge on an agreement's or statute's face. The Michigan Court of Appeals had ruled that state law sanctioned the use of nonunion members' fees for purposes other than collective bargaining. 60 Mich.App. 92, 99, 230 N.W.3d 322, 326 (1975). The plaintiffs had challenged such a use. The Supreme Court said that that was an issue not presented in *Hanson* and *Street* and one that required resolution. 97 S.Ct. at 1798. The Supreme Court remanded the case to the Michigan courts because it determined that "the general allegations in the complaint, if proven, establish a cause of action under the First and Fourteenth Amendments." *Id.* at 1800.

 The complaint before this court also states a cause of action. The Supreme Court distinguished between using service fees for collective bargaining purposes and for "political purposes" in *Abood.* The former is proper; the latter is not.

The Court said:

[The employees in *Abood*] argue that they may constitutionally prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative. We have concluded that this argument is a meritorious one.

One of the principles underlying the Court's decision in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659, was that contributing to an organization for the purpose of spreading a political message is protected by the First Amendment. Because "[m]aking a contribution . . . enables like-minded persons to pool their resources in furtherance of common political goals," *id.,* at 22, 96 S.Ct. at 636, the Court reasoned that limitations upon the freedom to contribute "implicate fundamental First Amendment interests," *id.* at 23, 96 S.Ct. at 636.

The fact that the appellants are compelled to make, rather than prohibited from making, contributions for political purposes works no less an infringement of their constitutional rights. For at the

heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State. . . .

. . . . .

We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political candidates or towards the advancement of other ideological causes not germane to its duties as collective bargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment.

*Id.* at 1799–1800 (citations and footnotes omitted).

Thus, the Court said that the Constitution does not necessarily prohibit a public sector union from expending funds collected from employees in the form of charges, dues, or assessments (i. e., service fees) for "political purposes." *Abood* establishes a two-part test. It is unconstitutional only when (1) the employee(s) object and (2) there is a threat of loss of government employment.

The plaintiffs here have objected to the use of the service fees for "political purposes." Therefore, the first part of the test is met.

 The freedom to associate for the purpose of advancing beliefs and ideas is protected by the First and Fourteenth Amendments. The government cannot require an individual to relinquish his or her First Amendment rights as a condition to public employment. *Id.* at 1799; *Elrod v. Burns,* 427 U.S. 347, 357–60, 96 S.Ct. 2673, 2681–83, 49 L.Ed.2d 547 (1976) (plurality opinion); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). The plaintiffs have alleged that HRS

§ 89–4 imposes such an unconstitutional requirement. Complaint ¶ 26. That issue is not before the court at this time, but its inclusion in the complaint satisfies the second part of the *Abood* test. The two-part test having been fulfilled, the complaint is sufficient to defeat the motions to dismiss for failure to state a claim upon which relief can be granted.

■ HRS § 89–4 is not unconstitutional on its face. It appears to be sounder than the agency-shop clause in *Abood*. HRS § 89–4 authorizes the deduction of a reasonable service fee *only* for negotiating and administering a collective bargaining agreement; i. e., for collective bargaining purposes. But the plaintiffs have charged in their complaint that the defendants are using the service fees for other than proper collective-bargaining purposes. They object to such use.[10] They also claim that their continued employment is conditioned upon payment of the service fee. Therefore, while HRS § 89–4 is constitutional on its face, the plaintiffs have stated a claim upon which relief can be granted regarding the actual use of the service fees. They must prove their claims to prevail on the merits, but their complaint withstands the Rule 12(b)(6) motions to dismiss.

In determining the merits of the plaintiffs' claims, the court will have to ascertain what is a proper collective-bargaining purpose and what is a "political purpose." The Supreme Court recognized the difficulty of that task, but it did not provide much guidance in *Abood*. The Court said:

There will, of course, be difficult problems in drawing lines between collective bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited. The Court held in *Street*, as a matter of statutory construction, that a similar line must be drawn under the Railway Labor Act, but in the public sector the

line may be somewhat hazier. The process of establishing a written collective-bargaining agreement prescribing the terms and conditions of public employment may require not merely concord at the bargaining table, but subsequent approval by other public authorities; related budgetary and appropriations decisions might be seen as an integral part of the bargaining process. We have no occasion in this case, however, to try to define such a dividing line. . . .

97 S.Ct. at 1800 (footnote omitted).

D. *Summary judgment*

The HEA seeks summary judgment in its favor because it has not received any monies from the service fees since July 1, 1975. There is no dispute that the only monies currently paid to the HEA by the HSTA is for partial payment of insurance premiums for HSTA employees and for repayment of certain debts owed to the HEA by the HSTA. The monies used for the repayment of the debts is not derived from the service fees.

Since the HSTA was selected as the bargaining representative for the teachers in 1971 and the original service fee was certified in 1971, it is clear that this case involves matters which occurred prior to July 1, 1975. The plaintiffs' claims extend back to 1972. The court must determine whether any service fees were used for "political purposes" since the service fees have been deducted from the plaintiffs' wages. The court must determine whether the HEA is liable to the plaintiffs for the entire period of time in question.

■ There is no dispute in the facts concerning the HEA for the period of time since July 1, 1975. The HEA has not received any monies from the service fees since that date. Therefore, it cannot be liable to the plaintiffs for any of its actions since July 1, 1975.[11] The court, however, cannot ascertain at this time what the

---

10. The complaining employees need only object to any "political" expenditure. They need not indicate the specific expenditures to which they object. *Abood*, 97 S.Ct. at 1802–03.

11. Unless, of course, in the future it should receive monies from the service fees which are used for "political purposes."

HEA's liability, if any, to the plaintiffs is for the period of time prior to July 1, 1975. There are material issues of fact in dispute as to that period of time. Hence, summary judgment is premature.

### E. *Abstention*

The case before the court is a federal civil rights action for the alleged infringement of the plaintiffs' constitutional rights, most notably their First Amendment rights. This court does have jurisdiction over this case.

■ If a federal district court has jurisdiction, then it can decide state issues as well as federal issues. *Siler v. Louisville & N. R. Co.*, 213 U.S. 175, 191–92, 29 S.Ct. 451, 53 L.Ed. 753 (1909). The court can decide the case without deciding the federal questions. *Id.* at 191, 29 S.Ct. 451. Further, it is preferred that the state issues be decided rather than to unnecessarily decide constitutional questions. *Id.* at 193, 29 S.Ct. 451; *Hagans v. Lavine*, 415 U.S. 528, 546, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 341, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J. concurring).

■ Similarly, where the Congress has not expressly set out exclusive federal jurisdiction, the state courts are competent to decide federal, as well as state, claims. *Claflin v. Houseman*, 93 U.S. 130, 23 L.Ed. 833 (1876); *Charles Dowd Box Co., Inc. v. Courtney*, 368 U.S. 502, 507–08, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962).

In an oft-quoted paragraph, then Chief Justice Marshall, speaking of the Supreme Court's appellate jurisdiction, said:

It is most true, that this court will not take jurisdiction if it should not; but it is equally true, that it must take jurisdiction, if it should. The judiciary cannot, as the legislature may, avoid a measure, because it approaches the confines of the constitution. We cannot pass it by, because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it

be brought before us. We have no more right to decline the exercise of jurisdiction which is given, then to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur, which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty. . . .

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 403, 5 L.Ed. 257 (1821). The same is true for this court.

But even if a federal court has jurisdiction, there are instances where a federal court will decline to exercise its jurisdiction. This is the doctrine of abstention.[12] The HSTA, the NEA, and the individual defendants urge this court to abstain in this case.

The abstention doctrine is said to have its origin in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Even before *Pullman*, federal courts have refused to exercise their jurisdiction, see 312 U.S. at 500–01, but *Pullman* seems to have clearly set out the doctrine.

In *Pullman*, the Texas Railroad Commission had issued an order that all sleeping cars operating on railroads in Texas must be continuously controlled by Pullman conductors. Some trains were operating without a Pullman conductor, the sleepers being in the charge of a porter. Pullman conductors were white, while porters on Pullmans were black.

The Pullman Co. and the railroads brought an action in federal court. The porters intervened as plaintiffs claiming racial discrimination. The Supreme Court began its discussion by saying:

The complaint of the Pullman porters undoubtedly tendered a substantial constitutional issue. It is more than substantial. It touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open. Such constitutional adjudication plainly can be

---

**12.** It is also referred to as the "Pullman doctrine."

avoided if a definitive ruling on the state issue would terminate the controversy. It is therefore our duty to turn to a consideration of questions under Texas law.

312 U.S. at 498, 61 S.Ct. at 644.

The railroad commission had acted pursuant to a Texas statute which gave the commission the power and authority to regulate the railroads in Texas. The Court said:

if the order [in question] is within the Commission's authority its subject matter must be included in the Commission's power to prevent "unjust discrimination * * * and to prevent any and all other abuses" in the conduct of railroads. Whether arrangements pertaining to the staffs of Pullman cars are covered by the Texas concept of "discrimination" is far from clear. What practices of the railroads may be deemed to be "abuses" subject to the Commission's correction is equally doubtful. . . . Had we or [the district court and the circuit court] no choice in the matter but to decide what is the law of the state, we would hesitate long before rejecting their forecast of Texas law. But no matter how seasoned the judgment of the district court may be, it cannot escape being a forecast rather than a determination. The last word on the meaning of [the Texas statute] and therefore the last word on the statutory authority of the Railroad Commission in this case, belongs neither to us nor to the district court but to the supreme court of Texas. In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication. The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court. The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication.

Id. at 499–500, 61 S.Ct. at 644–645 (citations omitted).

Here, the plaintiffs have alleged violations of their constitutional rights. As discussed, supra, HRS § 89–4 is constitutional on its face; it may be unconstitutional in its application. But the constitutional issue need not necessarily be reached. This case can be decided by a determination whether the defendants have violated HRS § 89–4. That determination would require the resolution of factual issues and an interpretation of HRS § 89–4 as to what is included in negotiating and administering the collective bargaining agreement. This court can interpret HRS § 89–4 and make the necessary factual findings. The state courts can also make those decisions. The question is which court should make the decisions: this court because it has jurisdiction of the constitutional claims or the state courts because a state statute is involved? [13]

The case at bar is a civil rights action. In Harrison v. N.A.A.C.P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1969), the Supreme Court applied the abstention doctrine to a civil rights case (jurisdiction based, inter alia, upon 42 U.S.C. §§ 1981 and 1983 for violations of the Fourteenth Amendment). Of the doctrine, the Court said:

In the service of this doctrine, which this Court has applied in many different contexts, no principle has found more consistent or clear expression than that the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them. This principle does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise; it serves the policy of comity inherent in the doctrine of abstention; and it spares the federal courts of unnecessary constitutional adjudication.

The present case, in our view, is one which calls for the application of this

13. Also, an area of state regulation may be involved since the National Labor Relations Act leaves the regulation of the labor relations of state and local governments to the states. Abood, 97 S.Ct. at 1793; 29 U.S.C. § 152(2).

principle, since we are unable to agree that the terms of these three statutes leave no reasonable room for a construction by the Virginia courts which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.

360 U.S. at 176–77, 79 S.Ct. at 1030 (citations omitted). *Accord Boehning v. Indiana State Employees Assoc., Inc.*, 423 U.S. 6, 6–8, 96 S.Ct. 168, 169–70, 46 L.Ed.2d 148 (1975).

*McNeese v. Board of Ed. for Com. Unit Sch. Dist. 187*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), was a desegregation suit. The defendants moved to dismiss the complaint on the ground, *inter alia*, that the plaintiffs had failed to exhaust their administrative remedies. The Court first reviewed *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), where it had said that a civil rights action is an independent remedy and that state remedies need not be exhausted. 373 U.S. at 671, 83 S.Ct. 1433.

The Court said that administrative remedies also need not be exhausted because "it is by no means clear that Illinois law provides petitioners with an administrative remedy sufficiently adequate to preclude prior resort to a federal court for protection of their federal rights." *Id.* at 674–75, 83 S.Ct. at 1437.

The Court said that abstention was not proper because there was

> no underlying issue of state law controlling this litigation. The right alleged is as plainly federal in origin and nature as those vindicated in *Brown v. Board of Education* . . . . Nor is the federal right in any way entangled in a skein of state law that must be untangled before the federal case can proceed.

*Id.* at 674, 83 S.Ct. at 1437.

The situation here is not that presented in *McNeese*. Here, there is an issue of state law which might resolve this case.

The plaintiffs argue that they need not exhaust administrative remedies if they seek relief for past and future deprivations of their civil rights. *Canton v. Spokane School District No. 81*, 498 F.2d 840, 844 (9th Cir. 1974) and *Whitner v. Davis*, 410 F.2d 24, 28 (9th Cir. 1969) support the plaintiffs. But abstention and exhaustion are separate concepts. The abstention doctrine does not require a reference to state administrative procedures. It allows a state court to interpret a state statute.

The Supreme Court says that special circumstances must exist before the abstention doctrine is applied. *Harris County Commissioners v. Moore*, 420 U.S. 77, 83–84, 95 S.Ct. 870, 875, 43 L.Ed.2d 32 (1975); *Zwickler v. Koota*, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). The Ninth Circuit views the abstention doctrine as a very narrow one. *Canton*, 498 F.2d at 845–46; *Stephens v. Tielsch*, 502 F.2d 1360, 1362 (9th Cir. 1974). The case here, however, is a classic case for abstention.

In *Canton*, the Ninth Circuit set out a test for "exceptional circumstances" justifying a court abstaining. It said:

> Ordinarily the "exceptional circumstances" must include all the basic elements of [*Pullman* ]:
>
> > (1) The complaint "touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open."
> >
> > (2) "Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy."
> >
> > (3) The possibly determinative issue of state law is doubtful.

498 F.2d at 845 (footnote omitted).[14]

In *Canton*, the court said that "It does not appear that there is a doubtful issue of state law which, if authoritatively resolved

14. In the omitted footnote the court noted that other "exceptional circumstances" justifying abstention have been recognized without the *Pullman* elements present. *E. g., Alabama Public Service Comm'n v. Southern R. Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951);

by the state courts, would dispose of the constitutional claims presented." 498 F.2d at 846. The same cannot be said of the case before the court. The *Pullman* elements are satisfied. Public sector unions is a sensitive area of social policy, witness *Abood* and this lawsuit. There is a question of state law which can resolve this case without reaching the constitutional question presented. The question of state law is unsettled. Thus, the *Canton* test is met.

Abstention has been held improper if it will result in a significant delay. *Hillsborough Township v. Cromwell*, 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358 (1946); *Baggett v. Bullitt*, 377 U.S. 360, 375–79, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 329, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964); *United States v. Nevada Tax Commission*, 439 F.2d 435 (9th Cir. 1971). The plaintiffs argue that abstention would result in an unreasonable delay because the state courts require that service fee complaints be raised before the HPERB before they are filed in state court and the HPERB has previously ruled that it lacks authority to rule on constitutional challenges to the service fee statute. But, if this court abstains and the plaintiffs must go to the HPERB, they need not raise the constitutional issue. Instead, they will be before the HPERB and the state courts on an interpretation of HRS § 89–4. Further,

the significant delay cases are distinguishable.[15]

The abstention doctrine is not an ironclad rule. Many courts dislike it; the Ninth Circuit takes a very narrow view of it. Special circumstances must exist before a court can abstain. Special circumstances are present in this case. Abstention is at the court's discretion and should be decided on a case-by-case basis. *Baggett v. Bullitt*, 377 U.S. at 375, 84 S.Ct. 1316; *Pullman Co.*, 312 U.S. at 500, 61 S.Ct. 643.

In *Harris County, supra*, the Supreme Court reviewed the doctrine, saying:

we have invoked the "Pullman doctrine" on numerous occasions. We have repeatedly warned, however, that because of the delays inherent in the abstention process and the danger that valuable federal rights might be lost in the absence of expeditious adjudication in the federal court, abstention must be invoked only in "special circumstances," and only upon careful consideration of the facts of each case.

Where there is an action pending in state court that will likely resolve the state-law questions underlying the federal claim, we have regularly ordered abstention. Similarly, when the state-law questions have concerned matters peculiarly within the province of local courts, we have inclined toward abstention. On the other hand, where the litigation has

*Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959).

15. In *Hillsborough Twp.*, the Court said that abstention was not proper because there was no state remedy available to the plaintiffs there. 362 U.S. at 628, 66 S.Ct. 445. In *Nevada Tax Commission*, the court said that the statute was not ambiguous and there was a serious question whether state remedies were available. 439 F.2d at 440. Here, there is an ambiguous statute and there is an available remedy.

In *Hostetter*, the Court said that there was no danger that a federal decision would work a disruption of an entire legislative scheme of regulation, neither party had requested abstention, and the litigation had already been long delayed. 377 U.S. at 329, 84 S.Ct. 1293. Here,

several of the defendants have requested abstention. The litigation has been delayed because the court was awaiting a decision by the Supreme Court in *Abood*. The *Abood* decision has clarified the issues and it has helped to create the state law question which has given rise to the abstention issue.

In *Baggett*, the Court said that the abstention doctrine involves a discretionary exercise of the court's equity powers and that special circumstances must exist. 377 U.S. at 375, 84 S.Ct. 1316. As discussed, *supra*, the requisite special circumstances exist in this case.

Also, in *Baggett* the Court said that there was no uncertainty about the meaning of the loyalty oath in question and that reference to the state court would not likely be of any assistance. *Id.* at 378, 84 S.Ct. at 1326. An interpretation of HRS § 89–4 is required in this case and would be of great assistance.

already been long delayed, or where it has seemed unlikely that resolution of the state-law question would significantly affect the federal claim, the Court has held that abstention should not be required.

Among the cases that call most insistently for abstention are those in which the federal constitutional challenge turns on a state statute the meaning of which is unclear under state law. If the state courts would be likely to construe the statute in a fashion that would avoid the need for a federal constitutional ruling or otherwise significantly modify the federal claim, the argument for abstention is strong. The same considerations apply where, as in this case, the uncertain status of local law stems from the unsettled relationship between the state constitution and a statute.

420 U.S. at 83, 95 S.Ct. at 875–76 (citations and footnote omitted).[16]

In *Pullman*, the Court abstained to allow the Texas courts to determine whether the commission had authority under the applicable Texas statute by interpreting the terms "discrimination" and "abuses." 312 U.S. at 499, 61 S.Ct. 643. Here, the court will abstain to allow the Hawaii courts to determine whether the HSTA has used the service fees for other than negotiating and administering a collective bargaining agreement.

When a court abstains it retains jurisdiction of the case, it does not dismiss the action. *American Trial Lawyers Association v. New Jersey Supreme Court*, 409 U.S. 467, 469, 93 S.Ct. 627, 34 L.Ed.2d 651 (1973).

The plaintiffs can raise all their claims, state and federal, in state court. *See N.A.A.C.P. v. Button*, 371 U.S. 415, 427, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *England v. Louisiana State Bd. of Med. Exam.*, 375 U.S. 411, 417–19, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). Or the plaintiffs may reserve the federal issues for the federal court. *England*, 375 U.S. at 420–22, 84 S.Ct. 461.

### III. CONCLUSIONS

In light of the foregoing, the court determines that:

1. It has subject matter jurisdiction.

2. The plaintiffs fail to allege a conspiracy as required by 42 U.S.C. § 1985(3). The claim for relief under 42 U.S.C. § 1985(3) should be dismissed, but the plaintiffs are granted leave to amend their complaint, if they so desire.

3. The plaintiffs do state a claim upon which relief can be granted.

4. There are material issues of fact in dispute; therefore, summary judgment is not proper at this time.

5. The court should abstain and allow the state courts to interpret HRS § 89–4 and determine whether the defendants have used monies from service fees for purposes other than the negotiation and administration of the collective bargaining agreement.

Therefore, IT IS HEREBY ORDERED that:

1. The HEA's motion for summary judgment is denied.

2. The individual defendants' motion to dismiss is denied.

3. The HSTA's and the NEA's motion to dismiss is granted with regard to the claim for relief under 42 U.S.C. § 1985(3) and is denied in all other respects.

4. This court abstains in this case until further order of the court.

5. The plaintiffs are to file a statement as to which issues in this litigation will be presented to the state court.

**16.** In the omitted footnote, the Court said that in *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), it had declined to order abstention where a federal due process claim was not complicated by an unresolved state law question even though the plaintiffs might have sought relief under a similar provision of the state constitution. Abstention is proper only when the challenged statute is part of an integrated scheme of related constitutional provisions, statutes, and regulations, and where the scheme as a whole calls for clarifying interpretation by the state courts. The plaintiffs here alleged violations of the Hawaii Constitution, but the claims are like those in *Constantineau*.

6. The parties shall inform this court as to the determination by the state court of the issues presented to it within ten (10) days after a final determination is made.