## RAILWAY EMPLOYES' DEPARTMENT, AMERICAN FEDERATION OF LABOR, ET AL. *v*. HANSON ET AL.

No. 451.   Argued May 2, 1956.—Decided May 21, 1956.

*Lester P. Schoene* argued the cause for appellants. With him on the brief was *Milton Kramer.*

*Edson Smith* argued the cause and filed a brief for Hanson et al., appellees.

By special leave of Court, *Robert A. Nelson,* Assistant Attorney General, argued the cause for the State of Nebraska, as *amicus curiae.* With him on the brief was *Clarence S. Beck,* Attorney General, for the State of Nebraska, *Richard W. Ervin,* Attorney General, for the State of Florida, and *Joe T. Patterson,* Attorney General, for the State of Mississippi. *William B. Rodman, Jr.,* Attorney General, also joined in the brief for the State of North Carolina.

Briefs of *amici curiae* urging affirmance were filed for the States of South Dakota, by *Phil Saunders,* Attorney General; Texas, by *John Ben Shepperd,* Attorney General, joined by *Eugene Cook,* Attorney General, and *E. Freeman Leverett* and *Robert H. Hall,* Assistant Attorneys General, for the State of Georgia; Utah, by *E. R. Callister,* Attorney General, and *Raymond W. Gee,* Assistant Attorney General; South Carolina, by *T. C. Callison,* Attorney General; Virginia, by *J. Lindsay Almond, Jr.,* Attorney General; and also by *Allen A. Lauterbach* for the American Farm Bureau Federation; *E. Smythe Gambrell, W. Glen Harlan* and *Whiteford S. Blakeney* for Bradford et al.; *William B. Barton* and

*Milton A. Smith* for the Chamber of Commerce of the United States; *Harry J. Harman* for Hooser et al.; *Lambert H. Miller* for the National Association of Manufacturers of the United States; *John C. Gall, John F. Lane, William F. Howe* and *Jerome Powell* for the National Right To Work Committee; *E. A. Simpson* for Sandsberry et al.; *J. C. Gibson, R. S. Outlaw, Wm. J. Milroy, C. G. Niebank, Jr., Donald R. Richberg, A. J. Folley* and *Preston Shirley* for the Gulf, Colorado & Santa Fe Railway Co. et al.; and *Tyre Taylor* for the Southern States Industrial Council.

Briefs of *amici curiae* urging reversal were filed by *J. Albert Woll* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations, and *Clarence M. Mulholland* and *Edward J. Hickey, Jr.* for the Railway Labor Executives' Association.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a suit brought in the Nebraska courts by employees of the Union Pacific Railroad Co. against that company and labor organizations representing various groups of employees of the railroad to enjoin the application and enforcement of a union shop agreement entered into between the railroad company and the labor organizations. Plaintiffs are not members of any of the defendant labor organizations and desire not to join. Under the terms of the union shop agreement all employees of the railroad, as a condition of their continued employment, must become members of the specified union within 60 days and thereafter maintain that membership. It is alleged that failure on their part to join the union will mean the loss of their employment together with seniority, retirement, pension, and other rights.

The employees claim that the union shop agreement violates the "right to work" provision of the Nebraska Constitution (Art. XV, § 13), which provides: [1]

"No person shall be denied employment because of membership in or affiliation with, or resignation or expulsion from a labor organization or because of refusal to join or affiliate with a labor organization; nor shall any individual or corporation or association of any kind enter into any contract, written or oral, to exclude persons from employment because of membership in or nonmembership in a labor organization."

They ask for an injunction restraining the railroad company from enforcing and applying the union shop agreement.

The answers deny that the Nebraska Constitution and laws control and allege that the union shop agreement is authorized by § 2, Eleventh of the Railway Labor Act, as amended, 64 Stat. 1238, 45 U. S. C. § 152, Eleventh, which provides that, notwithstanding the law of "any State," a carrier and a labor organization may make an agreement requiring all employees within a stated time to become members of the labor organization, provided there is no discrimination against any employee and pro-

---

[1] This constitutional provision is implemented by Neb. Rev. Stat., 1943, § 48–217, which provides:

"Labor organizations; no denial of employment; closed shop not permitted. To make operative the provisions of Sections 13, 14 and 15 of Article 15 of the Constitution of Nebraska, no person shall be denied employment because of membership in or affiliation with, or resignation or expulsion from a labor organization or because of refusal to join or affiliate with a labor organization; nor shall any individual or corporation or association of any kind enter into any contract, written or oral, to exclude persons from employment because of membership in or nonmembership in a labor organization."

vided that membership is not denied nor terminated "for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership." [2]

---

[2] Section 2, Eleventh reads as follows:

"Eleventh. Notwithstanding any other provisions of this Act, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this Act and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this Act shall be permitted—

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided*, That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership.

"(b) to make agreements providing for the deduction by such carrier or carriers from the wages of its or their employees in a craft or class and payment to the labor organization representing the craft or class of such employees, of any periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership: *Provided*, That no such agreement shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization of such membership dues, initiation fees, and assessments, which shall be revocable in writing after the expiration of one year or upon the termination date of the applicable collective agreement, whichever occurs sooner.

"(c) The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) shall be satisfied, as to both a present or future employee in engine, train, yard, or

The Nebraska trial court issued an injunction. The Supreme Court of Nebraska affirmed. It held that the union shop agreement violates the First Amendment in that it deprives the employees of their freedom of association and violates the Fifth Amendment in that it requires the members to pay for many things besides the cost of collective bargaining. The Nebraska Supreme Court, therefore, held that there is no valid federal law to supersede the "right to work" provision of the Nebraska Constitution. 160 Neb. 669, 71 N. W. 2d 526. The case is here by appeal. 28 U. S. C. § 1257 (1) and (2). We noted probable jurisdiction. 350 U. S. 910.

---

hostling service, that is, an employee engaged in any of the services or capacities covered in section 3, First (h) of this Act defining the jurisdictional scope of the First Division of the National Railroad Adjustment Board, if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this Act and admitting to membership employees of a craft or class in any of said services; and no agreement made pursuant to subparagraph (b) shall provide for deductions from his wages for periodic dues, initiation fees, or assessments payable to any labor organization other than that in which he holds membership: *Provided, however,* That as to an employee in any of said services on a particular carrier at the effective date of any such agreement on a carrier, who is not a member of any one of the labor organizations, national in scope, organized in accordance with this Act and admitting to membership employees of a craft or class in any of said services, such employee, as a condition of continuing his employment, may be required to become a member of the organization representing the craft in which he is employed on the effective date of the first agreement applicable to him: *Provided, further,* That nothing herein or in any such agreement or agreements shall prevent an employee from changing membership from one organization to another organization admitting to membership employees of a craft or class in any of said services.

"(d) Any provisions in paragraphs Fourth and Fifth of section 2 of this Act, in conflict herewith are to the extent of such conflict amended."

The union shop [3] provision of the Railway Labor Act was written into the law in 1951. Prior to that date the Railway Labor Act prohibited union shop agreements. 48 Stat. 1186, 45 U. S. C. § 152, Fourth and Fifth; 40 Op. Atty. Gen. 254. Those provisions were enacted in 1934 when the union shop was being used by employers to establish and maintain company unions, "thus effectively depriving a substantial number of employees of their right to bargain collectively." S. Rep. No. 2262, 81st Cong., 2d Sess., p. 3. By 1950, company unions in this field had practically disappeared. *Id.* Between 75 and 80% of railroad employees were members of labor organizations. H. R. Rep. No. 2811, 81st Cong., 2d Sess., p. 4. While nonunion members got the benefits of the collective bargaining of the unions, they bore "no share of the cost of obtaining such benefits." *Id.,* at 4. As Senator Hill, who managed the bill on the floor of the Senate, said, "The question in this instance is whether those who enjoy the fruits and the benefits of the unions should make a fair contribution to the support of the unions." 96 Cong. Rec., Pt. 12, p. 16279.

The union shop provision of the Railway Labor Act is only permissive. Congress has not compelled nor required carriers and employees to enter into union shop agreements. The Supreme Court of Nebraska nevertheless took the view that justiciable questions under the First and Fifth Amendments were presented since Congress, by the union shop provision of the Railway Labor

---

[3] The union shop is a variant of the closed shop, since union membership is required of every employee after the 60-day period designated in the Act.

In 1954 the Bureau of Labor Statistics made an analysis of 1,716 collective-bargaining agreements in effect in industries not regulated by the Railway Labor Act. Of the 7,405,000 workers covered by the agreements studied, 64% were employed under union shop provisions. 78 Monthly Labor Review, No. 6, 649.

Act, sought to strike down inconsistent laws in 17 States. Cf. *Hudson* v. *Atlantic Coast Line R. Co.*, 242 N. C. 650, 89 S. E. 2d 441; *Otten* v. *Baltimore & O. R. Co.*, 205 F. 2d 58. The Supreme Court of Nebraska said, "Such action on the part of Congress is a necessary part of every union shop contract entered into on the railroads as far as these 17 States are concerned for without it such contracts could not be enforced therein." 160 Neb., at 698, 71 N. W. 2d, at 547. We agree with that view. If private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded. Cf. *Smith* v. *Allwright*, 321 U. S. 649, 663. In other words, the federal statute is the source of the power and authority by which any private rights are lost or sacrificed.[4] Cf. *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192, 198–199, 204; *Railroad Trainmen* v. *Howard*, 343 U. S. 768; *Public Utilities Comm'n* v. *Pollak*, 343 U. S. 451, 462. The enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates, though it takes a private agreement to invoke the federal sanction.

As already noted, the 1951 amendment, permitting the negotiation of union shop agreements, expressly allows those agreements notwithstanding any law "of any State." § 2, Eleventh.[5] A union agreement made pursuant to the Railway Labor Act has, therefore, the imprimatur of the federal law upon it and, by force of the Supremacy Clause of Article VI of the Constitution, could not be made illegal nor vitiated by any provision of the laws of a State.

---

[4] Once courts enforce the agreement the sanction of government is, of course, put behind them. See *Shelley* v. *Kraemer*, 334 U. S. 1; *Hurd* v. *Hodge*, 334 U. S. 24; *Barrows* v. *Jackson*, 346 U. S. 249.

[5] The parallel provision in § 14 (b) of the Taft-Hartley Act (61 Stat. 151, 29 U. S. C. § 164 (b)) makes the union shop agreement give way before a state law prohibiting it.

We come then to the merits.

In the absence of conflicting federal legislation, there can be no doubt that it is within the police power of a State to prohibit the union or the closed shop. We so held in *Lincoln Union* v. *Northwestern Co.*, 335 U. S. 525, and in *American Federation of Labor* v. *American Sash Co.*, 335 U. S. 538, against the challenge that local "right to work" laws, including Nebraska's, violated the requirements of due process. But the power of Congress to regulate labor relations in interstate industries is likewise well-established. Congress has authority to adopt all appropriate measures to "facilitate the amicable settlement of disputes which threaten the service of the necessary agencies of interstate transportation." *Texas & N. O. R. Co.* v. *Railway Clerks*, 281 U. S. 548, 570. These measures include provisions that will encourage the settlement of disputes "by inducing collective bargaining with the true representative of the employees and by preventing such bargaining with any who do not represent them" (*Virginian R. Co.* v. *Federation*, 300 U. S. 515, 548), and that will protect the employees against discrimination or coercion which would interfere with the free exercise of their right to self-organization and representation. *Labor Board* v. *Jones & Laughlin*, 301 U. S. 1, 33. Industrial peace along the arteries of commerce is a legitimate objective; and Congress has great latitude in choosing the methods by which it is to be obtained.

The choice by the Congress of the union shop as a stabilizing force seems to us to be an allowable one. Much might be said *pro* and *con* if the policy issue were before us. Powerful arguments have been made here that the long-run interests of labor would be better served by the development of democratic traditions in trade unionism without the coercive element of the union or the closed shop. Mr. Justice Brandeis, who had wide experience in labor-management relations prior to his appointment to

the Court, wrote forcefully against the closed shop. He feared that the closed shop would swing the pendulum in the opposite extreme and substitute "tyranny of the employee" for "tyranny of the employer." [6] But the question is one of policy with which the judiciary has no concern, as Mr. Justice Brandeis would have been the first to concede. Congress, acting within its constitutional powers, has the final say on policy issues. If it acts unwisely, the electorate can make a change. The task of the judiciary ends once it appears that the legislative measure adopted is relevant or appropriate to the constitutional power which Congress exercises. The ingredients of industrial peace and stabilized labor-management relations are numerous and complex. They may well vary from age to age and from industry to industry. What would be needful one decade might be anathema the next. The decision rests with the policy makers, not with the judiciary.

It is said that the right to work, which the Court has frequently included in the concept of "liberty" within the meaning of the Due Process Clauses (see *Truax v. Raich,* 239 U. S. 33; *Takahashi* v. *Fish & Game Commission,* 334 U. S. 410), may not be denied by the Congress. The question remains, however, whether the long-range interests of workers would be better served by one type of

---

[6] See Mason, Brandeis, A Free Man's Life (1946), pp. 303–304, which quotes a letter of February 26, 1912, from Brandeis to Lincoln Steffens:

". . . But the American people should not, and will not, accept unionism if it involves the closed shop. They will not consent to the exchange of the tyranny of the employer for the tyranny of the employee. Unionism therefore cannot make a great advance until it abandons the closed shop; and it cannot accept the open shop as an alternative. The open shop means the destruction of the union.

"The advance of unionism demands therefore some relation between the employer and the employee other than either the closed or open shop, and I feel confident that we have found a solution in the preferential union shop."

union agreement or another. That question is germane to the exercise of power under the Commerce Clause— a power that often has the quality of police regulations. See *Cleveland* v. *United States,* 329 U. S. 14, 19. One would have to be blind to history to assert that trade unionism did not enhance and strengthen the right to work. See Webb, History of Trade Unionism; Gregory, Labor and the Law. To require, rather than to induce, the beneficiaries of trade unionism to contribute to its costs may not be the wisest course. But Congress might well believe that it would help insure the right to work in and along the arteries of interstate commerce. No more has been attempted here. The only conditions to union membership authorized by § 2, Eleventh of the Railway Labor Act are the payment of "periodic dues, initiation fees, and assessments." The assessments that may be lawfully imposed do not include "fines and penalties." The financial support required relates, therefore, to the work of the union in the realm of collective bargaining. No more precise allocation of union overhead to individual members seems to us to be necessary. The prohibition of "fines and penalties" precludes the imposition of financial burdens for disciplinary purposes. If "assessments" are in fact imposed for purposes not germane to collective bargaining,[7] a different problem would be presented.

---

[7] A number of appellant unions have broad powers to levy assessments for unspecified purposes. For example, the bylaws of the Railroad Yardmasters of America authorize the Executive Board to "levy assessments upon all the members affected when in its opinion such assessments are necessary." § 26. And § 27 provides: "Local lodges may levy such assessments upon their respective memberships as may be found necessary . . . ." The General Committee of a Subordinate Division of the Order of Railroad Telegraphers is authorized "to levy such assessments upon the members employed upon the transportation company over which it has jurisdiction as may be necessary to carry on its work." Subordinate Division Statutes, § 42 (H). And see Constitution of the Brotherhood of

Wide-ranged problems are tendered under the First Amendment. It is argued that the union shop agreement forces men into ideological and political associations which violate their right to freedom of conscience, freedom of association, and freedom of thought protected by the Bill of Rights.[8] It is said that once a man becomes a

Railroad Signalmen of America, Art. I, § 6; Constitution of the American Railway Supervisors Association, Art. XVI, § 7.

[8] The constitutions and bylaws of several appellant unions place restrictions on the individual members.

A. Some disqualify persons from membership for their political views and associations. Art. XIII, § 4, of the Constitution of the Brotherhood of Maintenance of Way Employes bars from membership anyone who is a member of the Communist Party. Another constitution renders ineligible for membership any person who is "a member of the Communist Party or of any other subversive group, or who subscribes to the doctrines of any such groups." Subordinate Lodge Constitution of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers of America, Art. VI, § 1. And see Subordinate Lodge Constitution of the Brotherhood Railway Carmen of America, § 6 (a). Art. 16, § 1 (a), of the Constitution of the Sheet Metal Workers' International Association provides: "No member of the communist party or any person who advocates the objectives thereof, and no person who belongs to or supports the policies of any other organization or group which advocates the overthrow of the United States government or the government of the Dominion of Canada by force shall be eligible" for membership.

The constitution of one of appellant unions provides that no person shall be eligible for union office "if such person associates himself with Communist, Fascist or similar organizations, or the Ku Klux Klan, or Columbians. Such eligibility shall likewise be denied where a person associates himself with, lends support or subscribes to the subversive doctrines of the organizations enumerated herein, similar organizations, or any organization or group that expounds or promotes any doctrine or philosophy inimical or subversive to the fundamental purposes of the constitution of the Government of the United States." Constitution of the Hotel & Restaurant Employees and Bartenders International Union, Art. XI, § 18. The Constitution of the International Association of Machinists, Art. I, § 5, provides: "A member who advocates or encourages communism, fascism,

member of these unions he is subject to vast disciplinary control [9] and that by force of the federal Act unions now can make him conform to their ideology.

---

nazism, or any other totalitarian philosophy, or who, by other actions, gives support to these 'philosophies' or 'isms' is not eligible to hold office in the I. A. M."

B. The Grand Lodge Constitution of the Brotherhood Railway Carmen of America prohibits members from "interfering with legislative matters affecting national, state, territorial, dominion or provincial legislation, adversely affecting the interests of our members." § 64.

The Constitution of the International Brotherhood of Electrical Workers, another of the appellant unions, forbids any member from "creating or attempting to create dissatisfaction or dissension among any of the members or among L. U.'s [Local Unions] of the I. B. E. W." Art. XXVII, § 2 (8). The same article and section further prohibits any member from

"(15) Attending or participating in any gathering or meeting whatsoever, held outside meetings of a L. U., at which the affairs of the L. U. are discussed, or at which conclusions are arrived at regarding the business and the affairs of a L. U., or regarding L. U. officers or a candidate or candidates for L. U. office.

"(16) Mailing, handing out, or posting cards, handbills, letters, marked ballots or political literature of any kind, or displaying streamers, banners, signs or anything else of a political nature, or being a party in any way to such being done in an effort to induce members to vote for or against any candidate or candidates for L. U. office, or candidates to conventions." And see Art. 17, § 1 (b), Constitution of the Sheet Metal Workers' International Association; Art. XXIV, § 2, Constitution of the International Association of Machinists.

C. A number of the constitutions of appellant unions provide for the use of compulsory dues and assessments to finance union insurance and death benefit plans. See, e. g., Constitution of the International Brotherhood of Firemen and Oilers, Art. I, § 22; Constitution of the Railroad Yardmasters of America, Art. VII, § 4; Constitution of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers of America, Art. VII, § 2.

[9] See Summers, Disciplinary Powers of Unions (1950), 3 Ind. & Lab. Rel. Rev. 483; Summers, Disciplinary Procedures of Unions

On the present record, there is no more an infringement or impairment of First Amendment rights than there would be in the case of a lawyer who by state law is required to be a member of an integrated bar. It is argued that compulsory membership will be used to impair freedom of expression. But that problem is not presented by this record. Congress endeavored to safeguard against that possibility by making explicit that no conditions to membership may be imposed except as respects "periodic dues, initiation fees, and assessments." If other conditions are in fact imposed, or if the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment, this judgment will not prejudice the decision in that case. For we pass narrowly on § 2, Eleventh of the Railway Labor Act. We only hold that the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work is within the power of Congress under the Commerce Clause and does not violate either the First or the Fifth Amendments. We express no opinion on the use of other conditions to secure or maintain membership in a labor organization operating under a union or closed shop agreement.

*Reversed.*

MR. JUSTICE FRANKFURTER, concurring.

The provision of law now challenged is the latest exercise by Congress of its power under the Commerce Clause to promote peaceful industrial relations in the

(1950), 4 Ind. & Lab. Rel. Rev. 15; Summers, Legal Limitations on Union Discipline (1951), 64 Harv. L. Rev. 1049; Aaron & Komaroff, Statutory Regulation of Internal Union Affairs (1949), 44 Ill. L. Rev. 425, 631; Wirtz, Government by Private Groups (1953), 13 La. L. Rev. 440; Williams, The Political Liberties of Labor Union Members (1954), 32 Tex. L. Rev. 826.

functioning of interstate railroads and thereby to further the national well-being. A mere recital of the course of history in this important field goes a long way to indicate that the main point of attack against the Act of January 10, 1951, 64 Stat. 1238, raises questions not of constitutional validity but of policy in a domain of legislation peculiarly open to conflicting views of policy. These efforts constitute a body of empiric responses by Congress to new problems or new insight for dealing with old problems.

The course of legislation affecting industrial controversies on railroads flows through these statutes: the Act of October 1, 1888, 25 Stat. 501; the Erdman Act of June 1, 1898, 30 Stat. 424, growing out of the Pullman strike of 1894, see *In re Debs,* 158 U. S. 564; the Newlands Act of July 15, 1913, 38 Stat. 103; the Adamson Law of September 3, 1916, 39 Stat. 721; Title III of the Transportation Act of 1920, 41 Stat. 456, 469; the Railway Labor Act of May 20, 1926, 44 Stat. 577; the Act of June 21, 1934, 48 Stat. 1185, amending the Railway Labor Act.

Nearly fifty years ago, the railroads successfully attacked the constitutionality of a vital feature of the Act of June 1, 1898, whereby Congress made it a criminal offense to bar employment in interstate railroads merely because of labor union membership. *Adair* v. *United States,* 208 U. S. 161 (1908). It is fair to say that this decision marks the nadir of denial to Congress of the power to regulate the conditions for assuring the Nation's dependence on the peaceful and effective operation of its railroads. The criticisms that the case aroused, see, *e. g.,* Richard Olney, Discrimination Against Union Labor— Legal?, 42 Amer. L. Rev. 161 (1908), and Roscoe Pound, Liberty of Contract, 18 Yale L. J. 454 (1909), were reflected in later decisions of the Court. Neither the Commerce Clause nor the Due Process Clause was thereafter conceived, at least so far as they restrain railroad labor

regulation, to be confined within such doctrinaire and frozen bounds as were confined the assumptions which underlay the decision in the *Adair* case. Thus, the Court sustained the Adamson Law, which was enacted to avert the threatened nation-wide railroad strike of 1916, *Wilson v. New,* 243 U. S. 332 (1917); Title III of the Transportation Act of 1920, *Pennsylvania R. Co.* v. *Railroad Labor Board,* 261 U. S. 72 (1923); and the Railway Labor Act of 1926, *Texas & New Orleans R. Co.* v. *Brotherhood of Railway & Steamship Clerks,* 281 U. S. 548 (1930); but see *Railroad Retirement Board* v. *Alton R. Co.,* 295 U. S. 330 (1935).

The change in the Court's understanding of industrial problems, certainly as they affect railroads, in their bearing upon the country's commerce and all that thereby hangs, to no small degree reflected the changed attitude of the railroads towards the rôle of railroad labor unions in the discharge of the functions of railroads. As striking evidence as any of this important shift in opinion is the fact that the Railway Labor Act of 1926 came on the statute books through agreement between the railroads and the railroad unions on the need for such legislation. It is accurate to say that the railroads and the railroad unions between them wrote the Railway Labor Act of 1926 and Congress formally enacted their agreement. I doubt whether there is another instance in the history of important legislation in which acknowledgment was so candidly made by a President of the United States that agreement reached between industrial disputants regarding legislation appropriate for securing their peaceful relations should become law. "I am informed," the President reported to Congress in his annual message of December 8, 1925, "that the railroad managers and their employees have reached a substantial agreement as to what legislation is necessary to regulate and improve their relationship. Whenever they bring for-

ward such proposals, which seem sufficient also to protect the interests of the public, they should be enacted into law." H. R. Doc. No. 2, 69th Cong., 1st Sess., p. 18. The President was Calvin Coolidge.

We have come full circle from the point of view in the *Adair* case. There the railroads, to repeat, successfully resisted an Act of Congress which outlawed what colloquially became known as the "yellow-dog contract." We are now asked to declare it beyond the power of Congress to authorize railroads to enter into voluntary agreements with the unions to which the overwhelming proportion of railway employees belong whereby all their workers are required to belong to such unions, provided, of course, that the unions be open unions, *i. e.,* that membership in the unions be available on ordinary, appropriate terms. It seems to me that the constitutional objections to this legislation were conclusively and compendiously answered by Mr. Justice Holmes in his dissent in *Adair* v. *United States, supra:*

> "Where there is, or generally is believed to be, an important ground of public policy for restraint the Constitution does not forbid it, whether this court agrees or disagrees with the policy pursued. It cannot be doubted that to prevent strikes, and, so far as possible, to foster its scheme of arbitration, might be deemed by Congress an important point of policy, and I think it impossible to say that Congress might not reasonably think that the provision in question would help a good deal to carry its policy along. But suppose the only effect really were to tend to bring about the complete unionizing of such railroad laborers as Congress can deal with, I think that object alone would justify the act. I quite agree that the question what and how much good labor unions do, is one on which intelligent people may

differ,—I think that laboring men sometimes attribute to them advantages, as many attribute to combinations of capital disadvantages, that really are due to economic conditions of a far wider and deeper kind—but I could not pronounce it unwarranted if Congress should decide that to foster a strong union was for the best interest, not only of the men, but of the railroads and the country at large." 208 U. S., at 191–192.

The Court has put to one side situations not now before us for which the protection of the First Amendment was earnestly urged at the bar. I, too, leave them to one side.