JACOBS, Chief Judge,
concurring:
I concur in the Court’s opinion. Insofar as it holds that the fee disclosure was adequate (and rules that plaintiffs’ counsel should not be appointed as class counsel), I rest upon that opinion entirely. As to the assessment of non-members for union organizing expenses, I concur — with these further observations.
A
As the Court’s opinion explains, expenses are chargeable only if they pay for activities that are (i) germane to collective bargaining; (ii) advance labor peace and avoid free-rider problems; and (iii) do not significantly add to the burden on First Amendment rights that inheres in the allowance of an agency shop. See Lehnert v. Ferris Faculty Ass’n, 500 U.S. 507, 519, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991). The Court’s opinion decides the case on the second Lehnert consideration — that these plaintiffs are not free-riders — and holds that, on this record, non-members of the union employed by the State as probation officers may not be assessed for the expense 'of organizing people in the private sector who work as couriers, or in the food service industry, or with persons having developmental disabilities. At the same time, the opinion leaves open the possibility that certain additional averments, if made, might (or might not) render the plaintiffs free-riders to some unstated degree or percentage. See Majority Op. at 790-91. The Court’s opinion does an admirable job of searching and parsing the present record, and I can hardly deny that additional averments of other facts may affect whether a nonmember of a union may become a free-rider; so I concur.
But I would decide this case on an alternative basis that is simple, obvious, and available. Giving effect to the third Lehnert consideration, I would hold — categorically — that the First Amendment is violated when public-sector unions charge dissenting nonmembers the cost of organizing private-sector employees.
B
“To compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests.” Abood v. Detroit Bd. of Educ., 431 U.S. 209, 222, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Abood considered the First Amendment implications of a public-sector union’s use of dissenting nonmembers’ compelled fees for several activities, some of them related to collective-bargaining, some not. The Court held that “insofar as the [challenged] service charges are applied to collective-bargaining, contract administration, and grievance-adjustment purposes,” there is no First Amendment violation. Id. at 232, 97 S.Ct. 1782 (relying on International Ass’n of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), and Railway Employees Department v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956)). But the First Amendment is violated when a public-sector union requires a dissenting nonmember to pay for “the support of an ideological cause he may oppose.” Abood, 431 U.S. at 235, 97 S.Ct. 1782.
In Abood, the Court had no occasion to consider the “difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited.” Id. at 236, 97 *795 S.Ct. 1782. Such lines were later drawn in Lehnert, which acknowledged that permissible agency shop fees burden the First Amendment rights of dissenting nonmembers to some irreducible degree, but listed three considerations that determine whether that burden exceeds the irreducible (and acceptable) minimum. See Lehnert, 500 U.S. at 518-19, 111 S.Ct. 1950; see also Seidemann v. Bowen, 584 F.3d 104, 111 (2d Cir.2009). As these three considerations (listed at the beginning of this concurrence) reflect, even activities that assist collective bargaining may nevertheless impose an impermissible burden on expression. On summary judgment, I accept the union-sponsored averment that organizing in the private sector assists collective bargaining on behalf of government workers (however attenuated and counter-intuitive that averment is); at the same time, however, such organizing imposes an impermissible burden on expression.
Lehnert teaches that there is likely to be an impermissible infringement on First Amendment rights when the challenged expenses relate to “expressive and ideological content ... about which individuals hold strong personal views” and when “the compelled speech is in a public context.” Lehnert, 500 U.S. at 521-22, 111 S.Ct. 1950. All union organizing is conducted by the public expression of views and ideas on which people can — and do — divide; and organizing that aims to expand public employment is especially controversial and divisive. For that reason, the challenged expenditures cannot be charged to the plaintiffs.
C
There can be no doubt that organizing expenses underwrite expressive and ideological content — here, that government employment should be augmented and that privatization should be frustrated and prevented. CSEA does not disagree. CSEA’s Director of Organizing defends the changeability of organizing expenses on the express ground that they help “maintain the wages, benefits and working conditions for CSEA’s membership and ... stem the loss of jobs [to workers in the private sector] for members of CSEA’s bargaining unit.” Decl. of Benjamin I. Gordon ¶ 29; see also id. ¶ 39 (“In sum, a major focus of CSEA’s organizing efforts is to stem the loss of jobs of employees represented by CSEA and to protect the wages and benefits of those employees from declining due to the presence of unorganized and lesser paid employees in the private sector.”). And in this appeal, CSEA affirmatively argues that its “organizing efforts [are] essential to deter public-sector employers from privatizing or contracting out the jobs of bargaining-unit members.” Appellees’ Br. at 7. But the more CSEA contends that the expenditures at issue are made to defeat privatization and promote government employment, the more CSEA reinforces the conclusion that such organizing is a quintessentially political act: “[D]ecisionmaking by a public employer is above all a political process.” Abood, 431 U.S. at 228, 97 S.Ct. 1782.
At the risk of being obvious, there is intense political controversy over privatization: what services the government should provide; whether and how much those services should expand; and which of those services should be contracted out.[1] New political issues are so consequential, divisive, and heated. On such matters, “worker and union cannot be said to speak with *796 one voice.” Lehnert, 500 U.S. at 521, 111 S.Ct. 1950. Government employees are also citizens, ratepayers, property owners, and members of families. Families with one member working for the government may include others working in the private sector. The union-sponsored affidavits argue that organizing the private sector reduces competition with government workers — although this seems to be a futile project.[2] In any event, courts should not presume that such a union goal trumps the First Amendment right to agitate for reform, austerity, and economy in government.
Finally, union organizational activity necessarily takes place in public — outside the union, outside the unionized workplace, and outside the halls and lobbies of the legislature. In that public context, the CSEA makes one argument to which all others are subsidiary: that union membership confers net benefits — a political and ideological perspective that is not obviously shared by dissenting workers in a union shop.
These considerations compel the conclusion that organizing activities “significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop.” Lehnert, 500 U.S. at 519, 111 S.Ct. 1950. Accordingly, and consistent with the First Amendment, public-sector unions should never be allowed to charge dissenting non-members the cost of organizing private-sector employees.
“Political speech must prevail against laws that would suppress it,” because “[t]he First Amendment confirms the freedom to think for ourselves.” Citizens United v. Federal Election Commission, — U.S. -, -, -, 130 S.Ct. 876, 898, 908, - L.Ed.2d -, -, - (2010). The right at issue in Citizens United was the right to engage in political speech. The obverse right — the right not to engage in political speech — commands the same level of protection. See Pac. Gas & Elec. Co. v. Pub. Utils. Comm’n of Cal., 475 U.S. 1, 11, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (“[A]ll speech inherently involves choices of what to say and what to leave unsaid .... The essential thrust of the First Amendment is to prohibit improper restraints on the voluntary public expression of ideas .... There is necessarily ... a concomitant freedom not to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect.” (internal quotation marks and emphases omitted)). Plaintiffs here have a right to be free from assessments used to promote views on public subjects — views that they do not choose to express, or affirmatively reject.
That is the basis on which I would decide this case.

. The Supreme Court has long acknowledged the lively debates over unionism, especially in the public sector. See, e.g., Abood, 431 U.S. at 229, 97 S.Ct. 1782 (“The distinctive nature of public-sector bargaining has led to widespread discussion about the extent to which the law governing labor relations in the private sector provides an appropriate model.”); *796 id. at 225 n. 20, 97 S.Ct. 1782; Hanson, 351 U.S. at 233-34, 76 S.Ct. 714 ("Powerful arguments have been made here that the longrun interests of labor would be better served by the development of democratic traditions in trade unionism without the coercive element of the union or the closed shop. Mr. Justice Brandéis ... wrote forcefully against the closed shop.”); id. at 235, 76 S.Ct. 714 ("To require, rather than to induce, the beneficiaries of trade unionism to contribute to its costs may not be the wisest course.”).

. Protecting government work by organizing the private sector is like trying to insulate one's home by heating the backyard. And since zoo-keepers are in the same bargaining unit as the probation officers, the causation principle becomes particularly zany in this case. Perhaps it is thought that food-service workers in the private sector compete for jobs with public-zoo workers who feed the seals.