In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3835

PAMELA J. HARRIS, et al.,

*Plaintiffs-Appellants*,

*v.*

GOVERNOR PAT QUINN,
in his official capacity as
Governor of the State of Illinois, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 CV 02477—**Sharon Johnson-Coleman**, *Judge.*

ARGUED JUNE 9, 2011—DECIDED SEPTEMBER 1, 2011

Before MANION, WOOD, and HAMILTON, *Circuit Judges.*

MANION, *Circuit Judge.* The plaintiffs in this appeal
provide in-home care for people with varying levels of
disabilities and other health needs. They present a
narrow question: Does a collective bargaining agree-
ment that requires Medicaid home-care personal
assistants to pay a fee to a union representative violate

the First Amendment, regardless of the amount of those fees or how the union uses them? We hold that it does not. Because the personal assistants are employees of the State of Illinois, at least in those respects relevant to collective bargaining, the union's collection and use of fair share fees is permitted by the Supreme Court's mandatory union fee jurisprudence in *Railway Employees' Dep't v. Hanson*, 351 U.S. 225 (1961), and *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977). However, we lack jurisdiction to consider the claims of plaintiffs who have opted not to be in the union. Because they are not presently subject to mandatory fair share fees, their claims are not ripe.

I.

The plaintiffs in this case all provide in-home care to disabled individuals through Medicaid-waiver programs run by the Illinois Department of Human Services. Some are part of the Home Services Program administered by the Division of Rehabilitation Services. The others are part of the Home Based Support Services Program administered by the Division of Developmental Disabilities. We will call these groups the Rehabilitation Program plaintiffs and Disabilities Program plaintiffs respectively.

A. *Home-Based Medicaid Waiver Program Features*

These programs subsidize the costs of home-based services for disabled patients who might otherwise

face institutionalization. The programs offer flexibility and self-direction for services that are tailored to patients' individual needs. In the Rehabilitation Program, each patient works with a counselor to develop an individual service plan, which specifies "the type of service(s) to be provided to the patient, the specific tasks involved, the frequency with which the specific tasks are to be provided, the number of hours each task is to be provided per month, [and] the rate of payment for the service(s)." 89 Ill. Admin. Code 684.50. The service plan must be certified by the patient's physician and approved by the State. *Id.* § 684.10.

Once a counselor identifies the type of personal assistant the patient needs for the service plan, the patient is free to select almost any personal assistant who meets the qualifications set by the State. *Id.* §§ 684.20, 684.30 The State, in turn, requires personal assistants to comply with age and work-hour limitations, provide written or oral recommendations from past employers, have related work experience or training, and satisfy the patient and counselor that they can communicate and follow directions. *Id.* § 686.10. Personal assistants sign employment agreements directly with patients, although the terms of the agreement are set by the State. *Id.* The State sets wages and pays personal assistants directly, withholding Social Security as well as federal and state taxes. *Id.* §§ 686.10, 686.40.

The Disabilities Program functions similarly. Each patient works with a State "service facilitator" to develop

a "service/treatment plan." 59 Ill. Admin. Code 117.120, 117.225(a). The State then pays for services provided under the plan, including personal care services. *Id.* at 117.215. The record is much less developed on the exact relationship between the State and the Disabilities Program personal assistants. And for good reason: the district court dismissed the claims on jurisdictional grounds, so no court has yet considered the merits of those claims.[1]

B. *Rehabilitation Program Unionization*

In the mid-1980s, personal assistants in the Rehabilitation Program sought to unionize and, under the Illinois Public Labor Relations Act, collectively bargain with the State. The State Labor Relations Board, however, found that the personal assistants were in a unique employment relationship and that it lacked jurisdiction over that relationship because the State was not their sole

---

[1] The details of the relationship between the State and the Disabilities Program personal assistants are unimportant for this appeal. As elaborated *infra*, we agree with the district court that the Disabilities Program claims are not yet ripe. But even if the claims were ripe, we would not consider the merits at this stage because the defendants have not cross-appealed seeking an expanded judgment on the merits. *See Greenlaw v. United States*, 128 S.Ct. 2559, 2564 (2008) ("Under that unwritten but longstanding rule, an appellate court may not alter a judgment to benefit a nonappealing party. . . . [without] a cross-appeal.").

employer. The personal assistants thus could not unionize until 2003, when the Illinois Public Labor Relations Act was amended to designate "personal care attendants and personal assistants working under the Home Services Program" as State employees for purposes of collective bargaining. 20 Ill. Comp. Stat. 2405/3. Then-Governor Blagojevich issued an executive order directing the State to recognize an exclusive representative for Rehabilitation Program personal assistants if they designated one by majority vote and to engage in collective bargaining concerning all employment terms within the State's control. According to the Governor, this was important because each patient employed only one or two personal assistants. Thus, only the State could control the economic terms of employment and the widely dispersed personal assistants could not "effectively voice their concerns" about the program or their employment terms without representation.

Later that year, a majority of the approximately 20,000 Rehabilitation Program personal assistants voted to designate SEIU Healthcare Illinois & Indiana as their collective bargaining representative with the State. The Union and the State negotiated a collective bargaining agreement which sets the pay rates, creates a health benefits fund for personal assistants, and establishes a joint Union-State committee to develop training programs. The agreement also contains other typical collective bargaining agreement provisions, including the union security clause that has given rise to this lawsuit and appeal. This "fair share" provision requires "all Personal

Assistants who are not members of the Union . . . to pay their proportionate share of the costs of the collective bargaining process, contract administration and pursuing matters affecting wages, hours and other conditions of employment."

## C. *Disabilities Program Attempted Unionization*

In 2009, Governor Pat Quinn issued an executive order directing the State to recognize an exclusive representative for the Disabilities Program personal assistants, if a majority so chose. *See* Ill. Exec. Order 2009-15. SEIU Local 713 petitioned for an election to become that representative, and AFSCME Council 31 intervened in the election as a rival candidate. In a mail ballot election, however, a majority of the approximately 4,500 Disabilities Program personal assistants rejected representation by either union. But that victory is not permanent: the unions can request new elections in the future, and, under Illinois labor law, may bypass an election altogether if they collect a sufficient number of union cards from the personal assistants. *See id.*; 80 Ill. Admin. Code 1210.100(b).[2]

---

[2] While the plaintiffs allege that the unions have used coercive tactics to get them and others to join, and to lobby state officials, the constitutional claim in this appeal is confined to the payment or potential payment of the fair share requirement.

D.  *Current Litigation*

The following year, the personal assistants from both groups filed a two-count complaint against the Governor and the three unions involved. The Rehabilitation Program plaintiffs claimed that the fair share fees they were required to pay violated the First Amendment by compelling their association with, and speech through, the Union. The Disabilities Program plaintiffs argued that although they did not yet pay fees, they are harmed by the mere threat of an agreement requiring fair share fees. The district court dismissed the Rehabilitation Program plaintiffs' claims for failure to state a claim upon which relief could be granted. It dismissed the Disabilities Program plaintiffs' claims for lack of subject matter jurisdiction because they lacked standing and their claims were not ripe. The plaintiffs appeal both dismissals.

II.

The two sets of plaintiffs in this case stand in very different positions. The Rehabilitation Program plaintiffs are currently subject to a collective bargaining agreement that requires them to pay fair share fees to their union representative. The Disabilities Program plaintiffs have successfully rejected unionization and are not subject to fair share fees, but fear that may change at any time. This difference has important consequences: we have jurisdiction to consider the Rehabilitation Program plaintiffs' claims, which we discuss in the first part of the analysis. But we must dismiss the

Disabilities Program plaintiffs' claims for lack of juris-diction because they are not ripe for adjudication. We explain these holdings in order.

A. *Rehabilitation Program Claims*

The Rehabilitation Program plaintiffs mount a facial challenge to the fair share fees. That is, they do not allege that the actual fees collected are too high or that the fees are being used for purposes other than col-lective bargaining.[3] Their only argument is that they may not be forced to financially support collective bar-gaining with the State under any circumstances. They present a two-step argument. First, they argue that this case does not fall under the line of Supreme Court cases permitting mandatory fees to support collective bargaining representation because personal assistants are employed by individual Medicaid patients, not the State. Second, they argue that no compelling state interests justify extending these collective bargaining cases to reach personal assistants.

We first set out the controlling precedent. The Supreme Court has long approved collective bargaining agreements that compel even dissenting, non-union

---

[3] The plaintiffs do argue that in the Medicaid context, collective bargaining with the State amounts to political advocacy. The Supreme Court has rejected this argument in the employment context, so it falls with our conclusion that personal assistants are State employees. *See generally*, *Abood*, 431 U.S. 209.

members to financially support the costs of collective bargaining representation, as well as other closely related costs, as long as they are not used to support political candidates or views, or other ideological causes. First in *Railway Employees' Dep't v. Hanson*, the Court refused to enjoin a "union shop" agreement between a railroad company and a union that required all employees of the railroad to become nominal, dues-paying members of the union as a condition of employment.[4] 351 U.S. at 227. Although a "right to work" provision in the Nebraska Constitution outlawed such agreements, the Court held that the federal Railway Labor Act permitted union shop agreements and thus superseded state law to the contrary. Along the way, it held that this provision of the Act was justified by Congress's interest in supporting "industrial peace and stabilized labor-management" and in distributing the costs of collective bargaining to all those who benefit from it. *Id.* at 234, 238. It declined to consider hypothetical First

---

[4] In a "union shop," an "employer may hire nonunion employees on the condition that they join a union within a specified time"; in an "agency shop," discussed below, "a union acts as an agent for the employees, regardless of the union membership." *Black's Law Dictionary* 1504 (9th ed. 2009). The Supreme Court has treated union and agency shops as "practical equivalent[s]." *See Abood*, 431 U.S. at 219 n.10. In an open shop, union membership is permitted but is not a condition of securing or maintaining employment. Under a state right-to-work law, "employees are not to be required to join a union as a condition of receiving or retaining a job." *Black's* at 1504.

Amendment issues that might arise if the union engaged in partisan or ideological speech. *Id.* at 238.

Then, in *Abood v. Detroit Bd. of Educ.*, the Court extended the scope of its holding in *Hanson* to include public employees and attempted to set out limits on the use of fees collected from dissenting employees. 431 U.S. 209. It held that an "agency shop" clause in an agreement between the Detroit Board of Education and its teachers' union could require teachers who were not union members to financially support the union's collective bargaining, contract administration, grievance-adjustment procedures, and other activities "germane to its duties as collective-bargaining representative." *Id.* at 232, 235. Since *Abood*, the Court has continued to refine its approach to the appropriate use of fees from non-union members in *Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986) (outlining appropriate procedures to protect non-member fees), and *Lehnert v. Ferris Faculty Assoc.*, 500 U.S. 507 (1991) (elaborating specific charges that can and cannot be funded with union donations). But it has not wavered from its position that, as a general matter, employees may be compelled to support legitimate, non-ideological, union activities germane to collective-bargaining representation.

Against this backdrop, we next consider whether the personal assistants are, as the defendants contend, State employees. If so, this case is controlled by *Abood* and the plaintiffs' claims fail. As an initial matter, we note that we pay no particular heed to the State legislature's designation of personal assistants as State employees

solely for purposes of collective bargaining under Illinois law. *See* 20 Ill. Comp. Stat. 2405/3(f). The label affixed by a state, whether in statute, regulation, or order, is not sufficient to designate the relationship "employment." Whether someone is an employee of the state has a host of implications—under both state and federal law—beyond whether mandatory union fees are permitted. Because of this, the Illinois legislature may have designated personal assistants as employees or not for reasons entirely unrelated to compelled speech under the First Amendment. Rather than accept either party's characterization of the relationship, we must consider the relationship itself and decide whether the State is an employer for purposes of compelling support for collective bargaining.

Two sources inform our analysis. First, neither *Hanson* nor *Abood* discusses the definition of employer, so we will assume the Court meant to give the word its ordinary meaning: "A person who controls and directs a worker under an express or implied contract of hire and who pays the worker's salary or wages." *Black's* at 604. Second, we draw from labor relations law the notion that more than one person or company may be an individual's employer. *Cf. Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964) (discussing joint employment determination by NLRB); *DiMucci Const. Co. v. NLRB*, 24 F.3d 949, 952 (7th Cir. 1994) (listing factors courts consider in reviewing an NLRB determination of joint employment). We are aware of no cases specifically discussing *Abood* in a joint-employ-

ment situation. But it is not an uncommon situation for a single individual to find himself with more than one employer for the same job. This undermines the plaintiffs' attempt to distinguish between the typical employer-employee relationship, on one hand, and every other imaginable labor relationship, on the other. Thus, both the home-care patient and the State may be employers if they each exercise significant control over the personal assistants.

And in the Rehabilitation Program, the State does have significant control over virtually every aspect of a personal assistant's job. While the home-care regulations leave the actual hiring selection up to the home-care patient, the State sets the qualifications and evaluates the patient's choice. 89 Ill. Admin. Code § 686.10. And while only the patient may technically be able to fire a personal assistant, the State may effectively do so by refusing payment for services provided by personal assistants who do not meet the State's standards. *Id.* § 677.40. When it comes to controlling the day-to-day work of a personal assistant, the State exercises its control by approving a mandatory service plan that lays out a personal assistant's job responsibilities and work conditions and annually reviews each personal assistant's performance. *Id.* §§ 686.10, 686.30. Finally, the State controls all of the economic aspects of employment: it sets salaries and work hours, pays for training, and pays all wages—twice a month, directly to the personal assistant after withholding federal and state taxes. *Id.*

In light of this extensive control, we have no difficulty concluding that the State employs personal assistants within the meaning of *Abood*.

The plaintiffs raise two objections. First, they claim that the patient, not the State, employs them. But as we have explained, even if the patient is properly considered an employer, that would not prevent the State from being a joint employer. Second, they argue that, however we characterize the State's relationship with personal assistants, the interests in collective bargaining that *Abood* identified does not apply here. They claim that the differences between the personal assistants here and the typical employment situation at issue in *Abood* undermine the State's claimed interest in labor peace. Specifically, the plaintiffs characterize *Abood*'s labor peace interest thus: "that disruptions caused by diverse employee expressive association within a workplace could be solved by giving a union a monopoly over employee speech vis-à-vis their employer." Pl. brief at 20. Thus, they assert that because the personal assistants are "outside the workplace" and they cannot be compelled to speak to the State with a single voice, the labor peace interest does not apply.[5]

---

[5] The plaintiffs further argue that outside the workplace, the government has no lawful interest in quelling diverse, even disruptive, speech or association. But we do not understand the complaint to allege that the State has quelled any of the plaintiffs' speech, merely that they have been forced to finan-

(continued...)

We do not accept the plaintiffs' narrow characterization of the labor peace interest. In *Hanson*, the Supreme Court reasoned that "[t]he ingredients of industrial peace and stabilized labor-management relations are numerous and complex" and a question of policy outside of the judiciary's concern. 351 U.S. at 234. The Court thus envisioned labor peace to include "stabilized labor-management relations," which are at issue in any employer-employee relationship, regardless of whether employees share the same workplace. The Court expanded its description of labor peace in *Abood*:

> The designation of a single representative avoids the confusion that would result from attempting to enforce two or more agreements specifying different terms and conditions of employment. It prevents inter-union rivalries from creating dissension with the work force and eliminating the advantages of employee collectivization. It also frees the employer from the possibility of facing conflicting demands from different unions, and permits the employer and a single union to reach agreements and settlements that are not subject to attack from rival labor organizations.

[5] (...continued)
cially support a single bargaining representative. Employee speech jurisprudence is entirely distinct from that of compelled association, as are the interests that justify (or not) each respective intrusion into employees' freedom of speech.

431 U.S. at 224. Given our conclusion that the State employs the personal assistants, with extensive control over the terms and conditions of employment, and has chosen (wisely or not) to establish some of those terms and conditions through negotiation rather than regulation, the interests identified by the Court in *Abood* are identical to those advanced by the State in this case. The plaintiffs' attempts to distinguish *Abood* are unavailing.

Thus, because of the significant control the state exercises over all aspects of the personal assistants' jobs, we conclude that personal assistants are employees of the State and reject the plaintiffs' arguments that the State's interests in collective bargaining do not apply to the unique circumstances of personal assistants. As such, the fair share fees in this case withstand First Amendment scrutiny—at least against a facial challenge to the imposition of the fees itself.

We once again stress the narrowness of our decision today. We hold that personal assistants in the Illinois home-care Medicaid waiver program are State employees solely for purposes of applying *Abood*. We thus have no reason to consider whether the State's interests in labor relations justify mandatory fees outside the employment context. We do not consider whether *Abood* would still control if the personal assistants were properly labeled independent contractors rather than employees. And we certainly do not consider whether and how a state might force union representation for other health care providers who are not state employees, as the plaintiffs fear. We hold

simply that the State may compel the personal assistants, as *employees*—not contractors, health care providers, or citizens—to financially support a single representative's exclusive collective bargaining representation.


B. *Disabilities Program Claims*

While the underlying legal issues raised by the Disabilities Program plaintiffs are similar to those we considered above, the district court dismissed their claims on ripeness and standing grounds. This is because the Disabilities Program plaintiffs are in a fundamentally different position. As we have noted, the Rehabilitation Program personal assistants have chosen to be represented by a union. Illinois is not a "right to work" state where paying dues for union membership is optional for each worker, and thus under state law the minority of caregivers opposed to the union may be required to pay their fair share of the dues used to bargain for pay, working conditions, and other universal benefits. The Disabilities Program personal assistants, on the other hand, have opted not to have union representation. By exercising that option, they have prevented collective bargaining and are not required to pay any fair share requirement. But because they are not subject to an agreement mandating fair share payments, we agree with the district court that the Disabilities Program plaintiffs' claims are not ripe, and we lack jurisdiction to consider the complaint.

A claim is not ripe if it "rests upon contingent future events that may not occur as anticipated, or indeed

may not occur at all." *Evers v. Astrue*, 536 F.3d 651, 662 (7th Cir. 2008) (quoting *Texas v. United States*, 523 U.S. 296 (1998)). The Disabilities Program plaintiffs complain of the same conduct as the Rehabilitation Program plaintiffs: that one of the unions and the State will enter into an agreement that will require all personal assistants to pay a fair share fee to support that union's collective bargaining activity. But unlike the Rehabilitation Program, the Disabilities Program personal assistants have rejected union representation, and there is no certainty that the Disabilities Program personal assistants will ever unionize. Hence, the State has no representative to recognize and cannot agree to compel the plaintiffs to pay fair share fees at all. The plaintiffs' claims are contingent on events that may never occur and thus are not ripe.

The plaintiffs argue that the very existence of the executive order committing the State to recognizing an exclusive union representative makes it significantly more likely that the plaintiffs will be forced to financially support that union's speech. Thus, there is a reasonable probability of future harm to the plaintiffs' constitutional interests, which the plaintiffs feel they should not have to spend resources to defeat. And they argue the courts can redress this harm by declaring that the plaintiffs may not be compelled to support a union, and by enjoining the State from enforcing its laws and executive orders in such a way that compels the plaintiffs to support a union.

But the plaintiffs do not allege that the mere existence of the executive order violates their rights, only that it

makes such a violation more likely. Their argument thus confuses this increased likelihood of a future *violation* of their constitutional rights with the probabilistic future *harm* which is sufficient to meet the minimal injury-in-fact requirements of standing. The cases on which the plaintiffs rely stand only for the rule that a constitutional violation now may merely increase the likelihood of injury later. That would be a question of constitutional standing and inapplicable to the issue of ripeness we have before us. *E.g., Southworth v. Board of Regents*, 307 F.3d 566, 580-81 (7th Cir. 2002) (students had standing to challenge a facially unconstitutional system for allocating student fees); *Majors v. Abell*, 317 F.3d 719, 721-22 (7th Cir. 2003) (candidates had standing to challenge unconstitutional regulation of political ads despite lack of enforcement); *Mulhall v. UNITE Local 355*, 618 F.3d 1279, 1286-87 (11th Cir. 2010) (employee had standing to challenge unlawful agreement to facilitate unionization despite possibility that it would never occur). This case is different because the only violations alleged by the plaintiffs may never occur.

The plaintiffs feel burdened fighting to prevent what they view as an unconstitutional collective bargaining agreement. But many individuals and organizations spend considerable resources fighting to prevent Congress or the state legislatures from adopting legislation that might violate the Constitution. The courts cannot judge a hypothetical future violation in this case any more than they can judge the validity of a not-yet-enacted law, no matter how likely its passage. To do so would be to render an advisory opinion, which is

precisely what the doctrine of ripeness helps to prevent. *Wisconsin Cent., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008) ("[R]ipeness, when it implicates the possibility of this Court issuing an advisory opinion, is a question of subject matter jurisdiction under the case-or-contro-versy requirement.").

The district court did err in one respect however. After holding that the Disabilities Program plaintiffs' claims were not yet ripe, it dismissed the complaint with preju-dice. Generally, when a complaint is dismissed because it is not ripe (or because the plaintiffs lack standing, for that matter) it is dismissed without prejudice unless it appears beyond a doubt that there is no way the plain-tiffs' grievance could ever mature into justiciable claims. *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 796 (7th Cir. 2002) (holding that district court erred in dis-missing counterclaims with prejudice because "[i]f a dispute ripens between the parties, [the counterclaimant] should have the opportunity to litigate its claims."). If the Disabilities Program personal assistants ever do vote to unionize and enter an agreement with the State man-dating fair share fees, the plaintiffs will have a ripe claim. Given our holding above, it may be that such a claim will not last long, but we will not prejudge the issue in this case. Therefore, we will remand the case to the district court with instructions to dismiss the claims of the Disabilities Program plaintiffs without prejudice.

## III.

For these reasons, we reject the plaintiffs' First Amend-ment claims. The Disabilities Program plaintiffs do not

allege that a constitutional violation has yet occurred. Thus, their claim is not ripe and we lack jurisdiction to consider it. But because the claim is unripe, it should be dismissed *without* prejudice, so we remand with instructions for the district court to correct the order of dismissal. The Rehabilitation Program plaintiffs do allege a justiciable claim, but we reject it on the narrow grounds that Supreme Court precedent permits the State, as a joint employer, to compel fair share fees in the interest of stable labor relations. The judgment of the district court is therefore AFFIRMED in part and REMANDED in part with instructions.